## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JANE DOE,

    *Plaintiff*,

v.

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES,
    5900 Capital Gateway Dr.
    Camp Springs, MD 20746,

JOSEPH B. EDLOW, in his official capacity
as Director, U.S. Citizenship and
Immigration Services,
    5900 Capital Gateway Dr.
    Camp Springs, MD 20746,

U.S. DEPARTMENT OF HOMELAND
SECURITY,
    2707 Martin Luther King Jr. Ave. SE
    Washington, DC 20528,

and

MARKWAYNE MULLIN, in his official
capacity as Secretary of Homeland Security,
    2707 Martin Luther King Jr. Ave. SE
    Washington, DC 20528,

    *Defendants*.

Civil Action No. 26-1336

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.    Noncitizens living in the United States rely on work authorization from the federal

government to secure financial stability, provide for their families, and contribute to the country's

1

economic vitality. Employment authorization documents (EADs) issued by U.S. Citizenship and Immigration Services (USCIS) allow vetted noncitizens to work in the country and to prove to employers that they are authorized to do so. EADs are valid for limited periods of time and noncitizens must renew them regularly.

2.      Because of longstanding and ongoing processing delays at USCIS, noncitizen workers have long faced a risk that their EADs will expire before the agency processes their applications for renewal. To mitigate that risk, the agency has, since 2016, provided automatic work permit extensions to workers in certain EAD categories who had timely filed renewal applications in the same category as their current EAD.

3.      On October 30, 2025, however, defendant USCIS, an agency within the Department of Homeland Security (DHS), issued an Interim Final Rule (IFR) that sharply increases the risk that hundreds of thousands of people will lose work authorization solely due to USCIS's own persistent backlog. The IFR abruptly eliminated automatic work permit extensions for all EADs as of the IFR's date of publication. EAD holders who filed or will file to renew on or after October 30, 2025, will lose work authorization on the expiration dates printed on their current EADs, regardless of how long their renewal application has been pending at USCIS.

4.      Plaintiff Jane Doe[1] brings this case to challenge the IFR eliminating automatic work permit extensions. Ms. Doe, a citizen of Mexico who has lived in the United States for nearly ten years, is a survivor of domestic violence who was granted immigration relief in the United States under the Violence Against Women Act (VAWA). Ms. Doe is the sole caregiver and financial provider for her eight-year-old daughter, who is a U.S. citizen. Ms. Doe has relied on the automatic work permit extension in the past to maintain her employment while USCIS processed her renewal

---

[1] Plaintiff is concurrently filing a motion to proceed under a pseudonym.

application. She applied in November 2025 to renew her current EAD, which expires at the end of June 2026. USCIS has not yet processed her renewal. Because of the IFR, she is at substantial risk that her work authorization will lapse, leaving her unable to work, to pay her bills, and to provide for her daughter.

5.    The IFR is unlawful. USCIS violated the procedural requirements of the Administrative Procedure Act (APA) by making this change immediately effective, without providing notice or an opportunity for public comment. Although USCIS invoked the APA's good-cause and foreign-affairs exceptions to notice-and-comment rulemaking, its rationales are unfounded. USCIS cited national security concerns and the need to vet applicants for immigration benefits, but a lapse in an EAD does not affect an individual's immigration status or their ability to remain in the United States. And critically, applicants for EAD renewals have already been vetted for work authorization.

6.     The rule is also arbitrary and capricious. It contravenes USCIS's statutory obligation to safeguard the nation's economic security; disregards the factual record underlying a December 2024 rulemaking on the same subject; rests on unsupported speculation contradicted by USCIS's own actions; and ignores the foreseeable and substantial harms to workers, families, employers, and the broader economy.

7.    If not vacated, the IFR will cause severe harm to Ms. Doe, as well as to other noncitizen workers and their families. Ms. Doe therefore brings this case to seek vacatur of USCIS's unlawful rule.

3

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the claims in this action arise under the laws of the United States, namely, the APA, 5 U.S.C. § 551, *et seq.*

9.      The promulgation of the IFR is a "final agency action" subject to judicial review by this Court. 5 U.S.C. §§ 702, 704, 706.

10.      Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because Defendants are agencies and officers of the United States sued in their official capacity, a Defendant resides in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

**PARTIES**

11.      Plaintiff Jane Doe is a 39-year-old resident of Houston, Texas. Since March 2022, Ms. Doe has held an EAD linked to her individual petition for immigration relief under VAWA. Her current EAD is valid through June 23, 2026. She submitted her renewal application on or around November 19, 2025.

12.      Defendant USCIS is an agency of the United States within the meaning of the APA, 5 U.S.C. § 551(1), and is a component of DHS that administers the program for employment authorization for noncitizens.

13.      Defendant Joseph B. Edlow is the Director of USCIS and is sued in his official capacity.

14.      Defendant DHS is an agency of the United States within the meaning of the APA, 5 U.S.C. § 551(1), and is charged with implementing and enforcing the Immigration and Nationality Act, 8 U.S.C. § 1103.

15.     Defendant Markwayne Mullin is Secretary of Homeland Security and is sued in his official capacity.

**FACTS**

### A.  Work authorization for noncitizen workers

16.     The Immigration and Nationality Act authorizes the Secretary of DHS to grant work authorization to noncitizens in the United States. *See, e.g.*, 8 U.S.C. §§ 1103(a), 1324a(h)(3)(B). The Homeland Security Act requires DHS to ensure that its homeland security efforts do not undermine the economic security of the United States. 6 U.S.C. § 111(b)(1)(F). Implementing these statutory provisions, DHS regulations at 8 C.F.R. § 274a.12(a), (b), and (c) identify three broad classes of noncitizens authorized to work in the United States.

17.     Individuals in categories listed in § 274a.12(a) are authorized to work based on their immigration status. Nonetheless, individuals in some class (a) categories—including refugees and asylees—frequently apply for, receive, and rely on an EAD because it serves as documentary proof of their work authorization.

18.     Individuals in categories listed in § 274a.12(b) are authorized to work for specific employers and, therefore, are not issued EADs.

19.     Individuals in categories listed in § 274a.12(c) include, among others, asylum applicants, green card applicants, and spouses of H-1B workers. The group also includes individuals, like Ms. Doe, who self-petition for immigration relief under VAWA—a form of immigration relief available to certain noncitizen survivors of abuse by U.S. citizens or permanent residents. Individuals in class (c) categories may work for any employer or engage in self-employment, subject to category-specific limitations. At all times, however, they must possess a valid EAD to remain authorized to work.

20.    Thus, individuals in all class (c) categories, and in some class (a) categories, apply to USCIS to obtain EADs.

21.    To receive an EAD, noncitizens must file a form I-765 and pay any required fee. USCIS officers check applications for completeness and verify evidence of identity, immigration status, and eligibility for work authorization. USCIS also conducts background and security checks for all EAD applicants, which can include an inquiry into criminal history and sometimes additional biometrics. After this vetting, USCIS can issue EADs to eligible applicants.

22.    Though EADs are issued with expiration dates, EAD holders may apply for renewal. Individuals in class (a) categories retain work authorization based on status even after their EADs expire, but many request renewed EADs to maintain proof of eligibility. Individuals in class (c) categories, like Ms. Doe, lose work authorization if their EADs expire before USCIS approves their renewal applications. Because employers face civil and criminal penalties for employing unauthorized workers, noncitizens without a valid EAD or some alternate documentation face a high risk of job loss, even if they remain legally eligible to work.

23.    Job loss resulting from an expired EAD has immediate and severe consequences for immigrant workers. Deprived of the ability to work, they face housing instability, food insecurity, and loss of access to medical services and childcare programs.

**B.  USCIS's chronic processing backlog**

24.    USCIS has had a persistent backlog in adjudicating employment authorization applications for more than a decade. The backlog and resulting delays have been repeatedly documented by USCIS, government data, academic research, and advocacy organizations.[2]

---

[2] *See, e.g.*, Catherine Rampell, *The Missing Immigrant Workers*, Wash. Post. (Nov. 22, 2021), https://www.washingtonpost.com/opinions/2021/11/22/legal-immigrant-workers-paperwork-renewal-backlog/; Nicole Narea, *Immigrants Could Help the U.S. Labor Shortage — if the*

25.    By the late 2010s, USCIS work permit backlogs had worsened significantly. Renewal applications for EADs often remained pending well beyond the original validity periods, forcing people out of work even when they were eligible to renew and had timely filed renewal applications.[3] By 2021, USCIS processing delays left tens of thousands of workers sidelined for months at a time and created widespread employment disruptions for workers who relied on a valid EAD to prove work eligibility. Employers across industries reported losing trained workers solely because USCIS could not adjudicate renewal applications before expiration of the EADs.[4]

26.    These chronic delays resulted directly from longstanding structural problems, including staffing shortages at USCIS, funding instability, the agency's policy of prioritizing applications for other immigration benefits, and increased procedural and interview requirements.[5]

27.    USCIS data confirms that the backlog remains persistent. As of June 30, 2025, more than 165,000 EAD renewal applications had been pending for more than 180 days.[6] Over the next three months, USCIS's backlog more than doubled. By September 30, 2025—the last date of

---

*Government Would Let Them*, Vox (Feb. 16, 2022), https://www.vox.com/policy-and-politics/22933223/work-permit-uscis-backlog-immigration-labor-shortage; *At Least Let Them Work: The Denial of Work Authorization and Assistance for Asylum Seekers in the United States*, Hum. Rts. Watch 17 (Nov. 12, 2013), https://www.hrw.org/sites/default/files/reports/us1113_asylum_forUPload.pdf.

[3] Kate Goettel, *Failure to Reauthorize Employment Harms Asylum Seekers and the U.S. Economy*, Am. Immigr. Council (Nov. 12, 2021), https://www.americanimmigrationcouncil.org/blog/employment-delays-asylum-seekers-economy/.

[4] Priscilla Alvarez, *'Quite Disruptive': Months-Long Processing Delays Leave People out of Work Amid Nationwide Labor Shortage*, CNN (Nov. 26, 2021), https://www.cnn.com/2021/11/26/politics/immigration-biden-work-permit-processing-delays.

[5] *See* Rampell, *supra* note 2.

[6] USCIS, *I-765, Application for Employment Authorization, Counts of Pending Petitions by Days Pending For All Eligibility Categories and (c)(8) Pending Asylum Category as of June 30, 2025*, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.

available data at the time of filing—more than 395,000 EAD renewal applications had been pending for more than 180 days.[7]

### C. USCIS's past efforts to avoid lapses in work authorization

28.     In multiple rulemakings and temporary rules, USCIS and its predecessor, the U.S. Immigration and Naturalization Service (INS), have recognized that delays in processing work authorization applications were widespread, persistent, and beyond the agency's ability to quickly resolve. The government further recognized that lapses in EADs cause foreseeable and severe harm to workers, families, employers, and the economy.

29.     USCIS and its predecessor have consistently taken steps to mitigate these harms.

30.     Starting in 1987, the INS adopted rules providing that, if the agency failed to process an EAD-renewal application within a certain amount of time—first 60, later 90, days—it would issue an interim EAD to allow the applicant to keep working while they waited. *See* 52 Fed. Reg. 16,216, 16,228 (May 1, 1987); 56 Fed. Reg. 41,767, 41,782 (Aug. 23, 1991). After USCIS took over administration of immigration adjudications from INS, it maintained the same approach to EAD renewals until 2016. *See* 81 Fed. Reg. 82,398, 82,410–11 (Nov. 18, 2016).

31.     Although the regulations provided for interim EADs, the agency often failed to issue them. And as USCIS has recognized, interim EADs could not achieve the goal of avoiding lapses in work authorization because the regulations provided for issuance only after the agency had already missed its own deadline. Compounding the problem, USCIS at the time did not permit applicants to file renewal applications until 120 days before expiration, *id.* at 82,456, leaving little margin for delay and increasing the risk of employment gaps.

---

[7] USCIS, *I-765, Application for Employment Authorization, Counts of Pending Petitions by Days Pending For All Eligibility Categories and (c)(8) Pending Asylum Category as of September 30, 2025*, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.

32. Acknowledging flaws in this approach, USCIS, after notice and comment, issued a new rule on November 18, 2016, that eliminated both the 90-day deadline and interim EADs. *See id.* at 82,401. In their place, USCIS adopted a provision granting automatic extensions of work authorization of up to 180 days for certain timely filed renewal applications. *Id.* at 82,491, *previously codified at* 8 C.F.R. § 274a.13(d).

33. Under this rule, which took effect on January 17, 2017, an EAD holder qualified for an automatic extension only if they (1) sought renewal under the same category as their expiring EAD, and (2) either remained authorized to work "incident to status" beyond the expiration of their EAD, or applied for renewal in categories that did not require USCIS to first adjudicate a separate, underlying immigration benefit. 81 Fed. Reg. at 82,459. This tailoring ensured that an extension applied only where a worker's long-term eligibility for work authorization had already been established. *See id.* at 82,463. Of the categories listed in 8 C.F.R. § 274a.12(a) and (c), USCIS identified fifteen that were eligible for an automatic extension, including VAWA self-petitioners, refugees, asylees, asylum applicants, and green card applicants. *Id.* at 82,455 & n.98.

34. Unlike interim EADs—which, in USCIS's view, consumed agency resources and often failed to prevent lapses—automatic work permit extensions allowed workers who timely submitted renewal applications the ability to continue working, uninterrupted by delays caused by the agency's backlog.

35. To further minimize the risk of employment gaps, USCIS also increased the window for filing an EAD renewal application from 120 days to up to 180 days prior to the EAD's expiration date, allowing USCIS more time to handle application surges and granting applicants more protection from processing delays. *Id.* at 82,457. Taken together, the ability to file to renew earlier and the automatic 180-day extension created a potential buffer of up to 360 days, which

9

USCIS viewed as a timeline that better matched operational realities. *See id.* at 82,460. Even with a 180-day extension, however, USCIS was unable to adjudicate all EAD renewals in time, causing many workers to experience lapses in employment authorization.

**D. Continuing work permit backlog and increase in automatic extension period**

36.     Since 2016, USCIS has increased the automatic extension period to up to 540 days—first, through two temporary final rules and, most recently, through a final rule issued in December 2024 after notice-and-comment rulemaking.

37.     First, in 2022, USCIS temporarily increased the extension period for certain applicants with pending renewals. This increase applied to (1) renewal applicants with pending EAD renewal applications as of May 4, 2022, whose EADs had not yet expired or whose 180-day extension had not yet lapsed; (2) new renewal applicants who filed during the 18-month window after the rule's publication (i.e., between May 4, 2022, and October 26, 2023); and (3) individuals already experiencing a lapse in employment authorization due to USCIS delays. 87 Fed. Reg. 26,614, 26,630 (May 4, 2022). This longer extension period covered, among other categories of EAD holders, VAWA self-petitioners, refugees, asylees, asylum applicants, spouses of H-1B visa holders, and green card applicants. *Id.* at 26,616–17.

38.     USCIS explained that this rule was necessary to prevent imminent and widespread lapses in work authorization caused by USCIS's own processing delays. Median processing times for renewal EADs had ballooned to 8 months, far exceeding the 180-day buffer provided by the 2016 rule. *Id.* at 26,618. By December 2021, approximately 66,000 applicants had already lost authorization while awaiting adjudication. *Id.* at 26,619.

39.     In issuing the rule, USCIS recognized that expiration of noncitizens' work authorization, or even the loss of physical proof of continued eligibility, forced employers to

terminate workers and deprived families of necessary income. Thus, to stabilize the workforce and prevent detrimental economic effects, USCIS concluded that the 180-day extension was "insufficient" and that a 540-day extension was necessary. *Id.* at 26,617.

40.     In April 2024, USCIS issued another temporary rule to address continuing delays in processing renewal applications, which risked causing lapses in work authorization for hundreds of thousands of individuals. 89 Fed. Reg. 24,628 (Apr. 8, 2024). Again, USCIS temporarily increased the automatic extension period from up to 180 days to up to 540 days for eligible EAD renewal applicants. *Id.* at 24,629. USCIS estimated that, without intervention, approximately 800,000 renewal applicants would risk losing work authorization solely because USCIS could not adjudicate their renewal applications in time. *Id.* at 24,629–30.

41.     After providing notice and an opportunity for comment, USCIS in December 2024 issued a final rule permanently extending automatic renewals to up to 540 days. 89 Fed. Reg. 101,208 (Dec. 13, 2024). This rule consolidated provisions from the 2022 and 2024 temporary rules—marking USCIS's decision to establish a long-term regulatory framework to prevent lapses in work authorization.

42.     USCIS provided several reasons for making the 540-day extension period permanent. The agency explained that, since 2016, USCIS work permit renewal processing times had consistently extended far beyond 180 days. USCIS also highlighted the widespread harms caused by lapses in work authorization, including job loss, family income disruption, employer turnover costs, and economic harm to state and local economies where EAD holders comprise essential parts of the workforce. *See id.* at 101,210–11, 101,228–29.

43.     In the preamble to the 2024 final rule, USCIS emphasized the value that the temporary expansions of the automatic extension had provided in recent years. The 2022

temporary rule had prevented or eliminated lapses for over 350,000 renewal applicants, and the 2024 temporary rule had done the same for hundreds of thousands more. *See id.* at 101,215. USCIS estimated that the two temporary extensions of automatic renewal periods would, over a five-year period, stabilize $10 billion in EAD-holders' earnings, save U.S. employers $3.5 billion in labor turnover costs, and yield $1.1 billion in employment tax transfers. *Id.* at 101,211, 101,256–60. These numbers, according to USCIS, reflected a reality in which long processing delays were not isolated or short-term, but systemic.

44.     For USCIS, the recurrent need for new temporary rules underscored the fragility of relying on emergency measures, leading the agency to conclude that a permanent structural adjustment was necessary. *See id.* at 101,215–16. A permanent 540-day automatic extension period ensured stability for hundreds of thousands of workers and their families, prevented employers from having to repeatedly react to unpredictable worker shortages, enabled USCIS to avoid emergency rulemaking and focus on long-term operational reforms, and provided a consistent buffer should processing times unexpectedly rise due to emergencies or application surges.

45.     The 540-day automatic extension was necessary but insufficient to prevent lapses in employment authorization. USCIS's final rule admitted as much, estimating that "upwards of 46,000 individuals" would experience a lapse over a three-year period, even with the 540-day extension due to USCIS's chronic backlogs. *See id.* at 101,229, 101,246.

**E.  Abrupt elimination of automatic work permit extensions**

46.     The 2025 Interim Final Rule (2025 IFR) abruptly reversed course and eliminated automatic work permit extensions altogether, without providing any alternative mechanism to prevent lapses in work authorization. 90 Fed. Reg. 48,799 (Oct. 30, 2025). Under this new rule, an EAD expires immediately upon the end of the validity period printed on the physical EAD card.

12

47.    USCIS gave two reasons for bypassing the APA's requirement for notice-and-comment rulemaking. First, USCIS invoked the "good cause" exception, *id.* at 48,812–13, asserting that immediate implementation of the rule was necessary to address what it characterized as an urgent national security and public-safety threat created by allowing previously vetted immigrants to continue working under automatic extensions. *Id*. at 48,808, 48,812–13. This assertion was a drastic departure from the explanation that USCIS had offered in preambles to the 2024 final rule and the 2022 and 2024 temporary rules, where it recognized that the harm caused by lapses in work authorization was both "substantial and unnecessary," and that "the potential for noncitizens to engage in unlawful actions [was] speculative." 89 Fed. Reg. at 101,216, 101,226.

48.    Second, USCIS invoked the APA's foreign affairs exception, 5 U.S.C. § 553(a)(1), to support its decision to bypass notice and comment. 90 Fed. Reg. at 48,814. According to USCIS, employment authorization practices implicate foreign affairs functions because they "affect[ ] the transfer of goods, including money, across the U.S. border" and are "part of the implementation of the President's foreign policy directives." *Id.* USCIS also posited, without elaboration, that engaging in notice and comment "would result in undesirable international consequences." *Id.* USCIS failed, however, to acknowledge that multiple federal courts of appeals decisions have rejected this broad view of the foreign affairs exception, recognizing that the agency's interpretation of the exception to encompass all immigration-related matters would swallow the rule requiring public input. *See, e.g.*, *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775–76 (9th Cir. 2018); *City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010).

49.    USCIS rested the 2025 IFR on a single policy rationale: the desire to complete vetting and security checks before approving an individual's EAD renewal. *See* 90 Fed. Reg. at

48,799–800, 48,803, 48,806–10, 48,817, 48,819. In the preamble to the 2025 IFR, USCIS asserted that automatic extensions allow individuals to maintain work authorization before USCIS completes its review, thereby enabling individuals to "continue to work and generate income to potentially finance nefarious activities that pose an imminent threat to the American public." *Id.* at 48,808. USCIS also claimed that automatic extensions undermine "benefit integrity" by allowing the continuation of employment authorization without a threshold determination of eligibility. *Id.* at 48,811. USCIS ignored, however, that it has the capability to continuously vet benefits applicants, such that it need not wait to conduct its review,[8] and that extensions are available only to applicants who already hold EADs and, thus, have already been vetted and deemed eligible at least once before.

50.　　Further, while millions of EAD holders have worked under automatic extensions for nearly ten years, the 2025 IFR provided no evidence that the existing system had allowed security risks to persist or resulted in later security-based denials. USCIS cited only a single incident in Colorado, *id.* at 48,813, without adequately supporting its claim that the individual in question had received an EAD extension or explaining how eliminating automatic extensions would have prevented the incident. And USCIS did not acknowledge that it had abruptly reversed its position from less than a year prior, when it concluded that the general "potential for noncitizens to engage in unlawful actions" while they remain in the United States was both "speculative" and disconnected from the question whether they could maintain legal authorization to work. *See* 89 Fed. Reg. at 101,226.

---

[8] *See* DHS, Privacy Impact Assessment for the Continuous Immigration Vetting (Feb. 14, 2019), https://www.dhs.gov/sites/default/files/publications/pia-uscis-fdnsciv-february2019_0.pdf.

51.     The 2025 IFR further implied that USCIS must assess whether renewal applicants "bear hostile attitudes" toward the "citizens, culture, government, institutions, or founding principles" of the United States. 90 Fed. Reg. at 48,807. USCIS does not explain how it will make such assessments, or how it would do so consistent with the First Amendment. *See American Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120 (D. Mass. 2025). Regardless, USCIS did not give any reasonable explanation for making this assessment as to EAD *renewal* applicants, who have already submitted extensive biographic and biometric information, have already been vetted and approved to work, have already established lives and employment in the United States, and are seeking only to continue working lawfully. Further, the agency gave no reason why it cannot make such assessments during the extension period, given that it is the agency's own backlog that prevents it from timely completing its review.

52.     USCIS also stated that automatic work permit extensions create compliance risks for employers because employers refer to a "non-secure" or "plain" paper receipt to determine the continuing validity of a facially expired EAD. Even as USCIS questioned the adequacy of its own receipts, it ignored an obvious solution: printing the notices on secure paper. *See* 90 Fed. Reg. at 48,809–10, 48,817.

53.     USCIS also stated that other policy changes will reduce overall EAD workloads and mitigate backlogs, reducing the need for an automatic work permit extension to prevent lapses. USCIS based that prediction on a specious assumption: that EAD renewal filings will "substantially decline" because this administration attempted to terminate the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) parole program and several countries' Temporary Protected Status (TPS) designations. *See id.* at 48,809 & n.110. USCIS ignored that many individuals who

15

entered the United States through CHNV and similar parole programs, or who previously had TPS, may have applied for other immigration relief, and will likely still require EAD adjudications.

54.     Moreover, USCIS failed to acknowledge that the existing backlog and processing delays remain significant, with more than 395,000 EAD renewal applications pending for more than 180 days as of the end of September 2025.[9] And there was no sign of that backlog easing; in the last full fiscal quarter before USCIS issued the IFR, the number of renewal applications pending for more than 180 days had more than doubled.[10] Citing similar persistent adjudication delays, only ten months earlier, USCIS had found that a permanent 540-day extension was necessary, 89 Fed. Reg. at 101,210–12, and that even a 180-day extension "does not provide USCIS enough time" to avoid harmful gaps in work authorization. *Id.* at 101,209–10.

55.     The 2025 IFR also ignored that a variety of other contemporaneous changes to EADs—including some uniquely within USCIS's own control—make it more likely, rather than less likely, that delays and backlogs will persist.

56.     In July, Congress placed a one-year cap on the length of EADs for certain groups. *See* Pub. L. No. 119-21, § 100003(b)(1), 139 Stat. 73, 366 (July 4, 2025).  In addition, on December 4, 2025, just weeks after issuing the IFR, USCIS announced a Policy Manual update shortening the maximum validity periods for certain categories of EADs from five years to 18 months.[11] As a result of these changes, at least hundreds of thousands of noncitizens will need to file EAD renewal applications more frequently, further clogging the queue for EAD adjudications at the

---

[9] *See supra* note 7.

[10] *See supra* notes 6 and 7.

[11] USCIS, *USCIS Increases Screening, Vetting of Aliens Working in United States* (Dec. 4, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-increases-screening-vetting-of-aliens-working-in-us.

very time that the IFR assumes the backlog would ease.[12] Yet the 2025 IFR eliminates the primary regulatory safeguard—automatic work permit extensions—that historically protected those workers from losing authorization during agency delays. USCIS failed to acknowledge the foreseeable effects of these changes on the backlog.

57.     In the 2025 IFR, USCIS acknowledged that authorization lapses caused by the IFR and agency backlog will result in "cost and transfer impacts such as lost compensation to workers, transfers between workers losing their work authorizations to replacement workers, employers' lost productivity when they are not able to quickly replace employees with lapses, and turnover costs for employers to find replacement employees." 90 Fed. Reg. at 48,817. And USCIS conceded that the IFR will increase the risk of loss of work authorization, which has "significant adverse consequences" for applicants and their families. *Id.* Inexplicably, USCIS failed to explain why such real-world harms, which USCIS's 2024 final rule aimed to prevent, are now justified.

58.     Finally, the 2025 IFR fails to address all the reliance interests created by nearly a decade of automatic work permit extensions. USCIS ignored, among other things, that noncitizens with legal work authorization engage in work that helps spur local and regional economic growth; contribute substantial taxes to state and local governments; and provide essential services to American consumers in healthcare, agriculture, construction, and other critical industries.

**F.  Harm caused by the IFR**

59.     The IFR's elimination of automatic extensions for EADs will cause immediate and significant harm to Ms. Doe, who relies on stable work authorization, as well as to other noncitizen immigrants and employers.

---

[12] USCIS, *Form I-765, Application for Employment Authorization: All Receipts, Approvals, Denials, Pending Grouped by Eligibility Category and Filing Type, April 1, 2025–June 30, 2025*, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.

60.     Ms. Doe has lived in the United States for nearly ten years. In 2017, she submitted a family-based petition for adjustment of status with her then-husband, a U.S. citizen, and in 2018, she received her first work permit. After leaving her husband due to domestic violence, Ms. Doe successfully petitioned for immigration relief under VAWA and applied for an EAD by virtue of her status as a VAWA self-petitioner. Since 2022, Ms. Doe has held a VAWA-based EAD (referred to as a C31 category EAD).

61.     Ms. Doe has since separately applied for a green card, along with the EAD that would come with that renewed application for adjustment of status. But it took USCIS more than six months to even acknowledge receipt of that application for a work permit based on that green-card application, and, to date, USCIS has not processed it.

62.     Ms. Doe has worked since 2020 as a Spanish-English interpreter, providing services to businesses in financial, insurance, and medical fields. She conducts this work as an independent contractor for two interpretation companies. In addition, she serves as an on-call and, occasionally, long-term substitute teacher for local charter schools. She also recently began providing tutoring services through a company.

63.     With her VAWA-based EAD set to expire on June 23, 2026, Ms. Doe timely filed an application to renew her work permit on November 19, 2025. Indeed, given her concerns about USCIS's processing delays, Ms. Doe requested to renew her EAD more than six months before its expiration—which USCIS policy now allows, although the agency does not recommend filing more than 180 days before expiration.[13] Due to the IFR, USCIS issued Ms. Doe a receipt notice

---

[13] USCIS, *Forms: I-765, Application for Employment Authorization*, https://www.uscis.gov/i-765 (last updated Apr. 13, 2026).

that does not provide for an automatic extension of her work authorization while her renewal application is pending.

64.     Ms. Doe has previously experienced first-hand the value of and need for the automatic extension of EADs. When Ms. Doe's last EAD was set to expire in March 2024, she applied for renewal more than four months in advance, in November 2023. Nonetheless, USCIS did not process her renewal application until the end of June 2024. With the benefit of the automatic extension in place at the time, Ms. Doe was able to maintain continuous employment— rather than face a lapse in her work authorization and three months of unemployment. The extension enabled her to continue working and, therefore, paying her bills and providing for her daughter. Now, without an extension, she faces the imminent risk that her work authorization will lapse before USCIS adjudicates her pending renewal application, forcing her employers to suspend or terminate her work.

65.     Ms. Doe is the sole breadwinner for her household. Her continued employment is necessary to maintain her family's financial stability, including her daughter's access to a childcare subsidy and Ms. Doe's own health insurance coverage, both of which are wage dependent. A lapse in work authorization would place Ms. Doe in the untenable position of being unable to work lawfully, causing her to lose both income and other critical support.

66.     Ms. Doe's experience is typical of noncitizen workers, who experience immediate and concrete harms when their work authorization lapses or is interrupted. The cascading effects of an inability to work are particularly acute for VAWA self-petitioners and other noncitizens who are lawfully present in this country but largely cannot access public benefits.[14]

---

[14] *See* Krisztina E. Szabo et al., *Early Access to Work Authorization For VAWA Self-Petitioners and U Visa Applicants*, Nat'l Immigrant Women's Advoc. Project at 8–13 (Feb. 12, 2014),

67.    Lapses in work authorization often impair a worker's physical and mental health. Exclusion from lawful employment correlates with increased psychological distress, heightened anxiety, and poorer health outcomes.[15] Repeated employment gaps also inflict serious harm on families, particularly children. Delayed work permits destabilize household finances and increase parental stress. Prolonged parental unemployment directly affects early childhood development, leading to increased behavioral issues and interrupted education.[16] Altogether, following a lapse in work authorization, families face compounding stressors that undermine long-term well-being.

68.    Work authorization lapses also deprive families of essential identification. For immigrant households in states with restrictive driver's license access laws, an EAD may function as their only available form of government-issued photo identification.[17] When an EAD expires due to processing delays, with no immediate option for renewal or extension, children and parents risk losing access to schools, medical care, childcare programs, and other services that require valid identification.

69.    These harms extend beyond individual households to employers. Businesses are forced to terminate employees for whom a valid EAD is their only means to prove work authorization—even when those employees remain eligible and have timely filed renewal

---

https://niwaplibrary.wcl.american.edu/wp-content/uploads/2015/FINAL_Report-on-Early-Access-to-EAD_02.12.pdf.

[15] Kevin F. Lee et al., *The Legacy of Immigration Policies and Employment Exclusion: Assessing the Relationship Between Employment Exclusions and Immigrant Health*, SSM Population Health (2024), https://pubmed.ncbi.nlm.nih.gov/38711566/.

[16] Inst. for Child Success, *Impact of Delayed Work Permits on Early Childhood Development* (Nov. 2023), https://assets.ctfassets.net/mioke9r0jdxg/6SDxt30aWk689Cpb3TPeoo/abfded5e9e2816bcd587eb22dca9701c/2023.11_Impact_of_Delayed_Work_Permits_on_Early_Childhood_Development.pdf.

[17] Alisa Reznick, *Without Automatic Work Authorization Renewals, Immigrant Children Could Lose Their Only ID*, KJZZ PHX (Nov. 11, 2025), https://www.kjzz.org/fronteras-desk/2025-11-11/without-automatic-work-authorization-renewals-immigrant-children-could-lose-their-only-id.

applications. Thus, employers lose trained workers, incur turnover costs, and face operational disruptions, particularly in industries already experiencing labor shortages.[18]

70.    These disruptions are concentrated in essential sectors that rely heavily on immigrant labor, including education, manufacturing, healthcare, food production, hospitality, and construction.[19] Because immigrants comprise a significant share of the workforce in these industries, when they are terminated en masse, remaining employees must shoulder heavier workloads, and employers will struggle to maintain production and services.[20]

71.    Local and regional economies also suffer when eligible workers like Ms. Doe cannot work. Employers delay expansion, reduce output, or shift costs to consumers when they cannot retain authorized employees. Small businesses are particularly affected because they lack the capacity to rapidly replace experienced workers.[21] Immigrants also contribute billions of dollars annually in federal, state, and local taxes.[22] When individuals who are already present, authorized, and willing to work cannot work due to administrative delay, governments lose tax revenue while communities experience increased economic strain.

72.    The cumulative effect of these harms will undermine economic stability, public health, and the efficient functioning of the labor market. These harms occur across communities,

---

[18] Bruce Crumley, *How a Work Permit Renewal Change Threatens Companies and Employees With Legal Troubles*, Inc. (Oct. 31, 2025), https://www.inc.com/bruce-crumley/how-a-work-permit-renewal-change-threatens-companies-and-employees-with-legal-troubles/91258342.

[19] USA Facts, *Which Industries Employ the Most Immigrant Workers?* (last updated Nov. 6, 2025), https://usafacts.org/articles/which-industries-employ-the-most-immigrant-workers/.

[20] Andrea Hsu, *Factories from GE to Kraft Heinz Lose Immigrant Workers, Stressing Those Who Remain*, NPR (Aug. 11, 2025), https://www.npr.org/2025/08/11/nx-s1-5496335/trump-immigration-workers-parole-tps.

[21] *See* Rampell, *supra* note 2; Narea, *supra* note 2.

[22] Nan Wu, *Immigrants Punch Above Their Weight as Taxpayers*, Am. Immig. Council (Apr. 14, 2022), https://www.americanimmigrationcouncil.org/blog/immigrants-as-taxpayers-2022/.

industries, and regions, affecting individual workers like Ms. Doe as well as employers, families, and the broader public.

## CLAIMS FOR RELIEF

## COUNT I
### Administrative Procedure Act – Without Observance of Procedure Required by Law
### 5 U.S.C. § 706(2)(D)

73. The APA authorizes courts to "hold unlawful and set aside agency action" that is taken "without observance of procedures required by law." 5 U.S.C. § 706(2)(D).

74. Subject to narrow exceptions, the APA requires agencies to provide the public notice and an opportunity to comment before issuance of legislative rules. *See* 5 U.S.C. § 553.

75. The IFR is a legislative rule.

76. Defendants made the IFR effective immediately, without providing public notice or opportunity for public comment.

77. No exception to the APA's requirement of notice-and-comment rulemaking applied to the IFR, including the good-cause exception and the foreign-affairs exception.

78. Accordingly, Defendants have acted without observance of procedure required by law, in violation of the APA.

## COUNT II
### Administrative Procedure Act – Arbitrary and Capricious
### 5 U.S.C. § 706(2)(A)

79. The APA directs courts to hold unlawful and set aside agency actions that are "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

80. The 2025 IFR is not supported by a reasoned explanation. Defendants failed to consider important aspects of the ongoing problem, disregarded facts and circumstances that underlay the 2024 final rule, failed to consider reasonable alternatives to the IFR, ignored

important reliance interests, and offered explanations for their decision that run counter to the evidence before them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Issue an order staying the effective date of the 2025 IFR under 5 U.S.C. § 705, and/or a preliminary injunction pending the Court's final adjudication of the Plaintiff's claims;

b. Declare that the 2025 IFR is unlawful because it was issued without procedure required by law and is arbitrary and capricious;

c. Vacate and set aside the 2025 IFR;

d. Enjoin Defendants from taking any steps to implement or enforce the 2025 IFR;

e. Award Plaintiff her attorneys' fees and costs; and

f. Grant such other and further relief as this Court deems proper.


Dated: April 20, 2026                   Respectfully submitted,


                                        /s/ Stephanie B. Garlock

Jessica R. Hanson*                      Stephanie B. Garlock (DC Bar. No. 1779629)
Juan E. Bedoya*                         Hoyeon Kelly Lew (DC Bar No. 90028415)
Asylum Seeker Advocacy Project          Public Citizen Litigation Group
228 Park Ave. S., #84810                1600 20th Street NW
New York, NY 10003-1502                 Washington, DC 20009
(646) 647-6779                          202-588-1000
jess.hanson@asaptogether.org            sgarlock@citizen.org
juan.bedoya@asaptogether.org


\* Application for admission *pro hac vice*
forthcoming


*Attorneys for Plaintiff Jane Doe*


23