**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JANE DOE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 26-1336 |
| U.S. CITIZENSHIP AND IMMIGRATION SERVICES, et al., | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR A STAY**
**UNDER 5 U.S.C. § 705 AND FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

Table of Authorities ............................................................................................................ ii

Introduction ....................................................................................................................... 1

Background ........................................................................................................................ 2

       A.      Statutory and Regulatory Framework Governing Employment Authorization ...... 2

       B.      Persistent USCIS Backlogs and Adjudication Delays ............................................. 3

       C.      Evolution of Regulatory Safeguards to Prevent Lapses in Work Authorization .... 4

       D.      The 2025 Interim Final Rule ................................................................................... 5

       E.      Plaintiff Jane Doe .................................................................................................... 6

Legal Standards ................................................................................................................. 7

Argument ........................................................................................................................... 8

    I.     Ms. Doe is likely to succeed on the merits. ................................................................ 8

       A.      Ms. Doe has standing. ............................................................................................. 8

       B.      Ms. Doe is likely to succeed on the merits of her claims. .................................... 13

           1.      The IFR is final agency action. ................................................................... 13

           2.      The IFR was issued without procedure required by law. ............................. 13

           3.      The IFR is arbitrary and capricious. ........................................................... 24

    II.    Ms. Doe will suffer irreparable injury unless this Court stays the IFR. ..................... 31

    III.    The balance of equities and public interest favor Ms. Doe ......................................... 34

    IV.    The Court should stay the IFR under section 705 and issue appropriate injunctive relief. ........................................................................................................................... 36

Conclusion ....................................................................................................................... 37

## TABLE OF AUTHORITIES

**Cases**

*Ahmed v. Noem*,
No. 25-cv-1351, 2025 WL 2299447 (D.D.C. Aug. 8, 2025).......................................................33

*Air Line Pilots Ass'n, International v. Chao*,
889 F.3d 785 (D.C. Cir. 2018)...................................................................................................9

*Altschuld v. Raimondo*,
No. 21-cv-02779, 2021 WL 6113563 (D.D.C. Nov. 8, 2021)....................................................35

*American Federation of Government Employees, AFL-CIO v. Block*,
655 F.2d 1153 (D.C. Cir. 1981).................................................................................... 14, 15, 21

*American Federation of Labor & Congress of Industrial Organizations v. NLRB*,
57 F.4th 1023 (D.C. Cir. 2023)................................................................................................14

*American Wild Horse Presidential Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017).................................................................................................28

*Amica Center for Immigrant Rights v. Executive Office for Immigration Review*,
No. 26-cv-696, 2026 WL 662494 (D.D.C. Mar. 8, 2026) ..........................................................23

*Angelica S. v. HHS*,
786 F. Supp. 3d 158 (D.D.C. 2025)..........................................................................................31

*Asylumworks v. Mayorkas*,
No. 20-cv-3815, 2021 WL 2227335 (D.D.C. June 1, 2021)......................................................10

*Attias v. Carefirst, Inc.*,
865 F.3d 620 (D.C. Cir. 2017).................................................................................................9

*Automobile Parts & Accessories Ass'n v. Boyd*,
407 F.2d 330 (D.C. Cir. 1968).................................................................................................14

*Bennett v. Spear*,
520 U.S. 154 (1997).................................................................................................................13

*Bloomberg L.P. v. SEC*,
45 F.4th 462 (D.C. Cir. 2022).................................................................................................13

*Cabrera v. U.S. Department of Labor*,
792 F. Supp. 3d 91 (D.D.C. 2025)............................................................................................8

* *Capital Area Immigrants' Rights Coalition v. Trump*,
  471 F. Supp. 3d 25 (D.D.C. 2020) ........................................................ 11, 15, 19, 20, 21, 22, 24

*Cato Institute v. SEC*,
  4 F.4th 91 (D.C. Cir. 2021) ................................................................................................. 11

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .......................................................................................... 8, 31

*City of New York v. Permanent Mission of India*,
  618 F.3d 172 (2d Cir. 2010) .......................................................................................... 21, 22, 23

*Coalition for Humane Immigrant Rights v. Noem*,
  805 F. Supp. 3d 48 (D.D.C. 2025) ....................................................................................... 36

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. 451 (2017) .............................................................................................................. 9

*Damus v. Nielsen*,
  313 F. Supp. 3d 317 (D.D.C. 2018) .................................................................................... 34

*Department of Education v. Brown*,
  600 U.S. 551 (2023) ............................................................................................................ 13

\**DHS v. Regents of the University of California*,
  591 U.S. 1 (2020) ............................................................................................................ 24, 31

*District of Columbia v. USDA*,
  444 F. Supp. 3d 1 (D.D.C. 2020) ....................................................................................... 8, 32

*E.B. v. U.S. Department of State*,
  583 F. Supp. 3d 58 (D.D.C. 2022) .................................................................................... 22, 24

*Electronic Privacy Information Center v. Presidential Advisory Commission on Election
  Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ............................................................................................. 8

*Encino Motorcars LLC v. Navarro*,
  579 U.S. 211 (2016) ............................................................................................................ 28

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................................................ 28

*General Chemical Corp. v. United States*,
  817 F.2d 844 (D.C. Cir. 1987) ........................................................................................... 28

*Gona v. USCIS*,
No. 1:20-cv-3680, 2021 WL 736810 (D.D.C. Feb. 25, 2021)............................................. 32, 33

*Grace v. Barr*,
965 F.3d 883 (D.C. Cir. 2020) ...................................................................................... 29

*Growth Energy v. EPA*,
5 F.4th 1 (D.C. Cir. 2021).............................................................................................. 12

*Humana of South Carolina, Inc. v. Califano*,
590 F.2d 1070 (D.C. Cir. 1978) .................................................................................... 21

*International Brotherhood of Teamsters v. Peña*,
17 F.3d 1478 (D.C. Cir. 1994) ...................................................................................... 22

*International Union, United Mine Workers v. MSHA*,
407 F.3d 1250 (D.C. Cir. 2005) .............................................................................. 14, 35

*Jean v. Nelson*,
711 F.2d 1455 (11th Cir. 1983) .................................................................................... 21

*Jifry v. FAA*,
370 F.3d 1174 (D.C. Cir. 2004) .............................................................................. 16, 20

*Judulang v. Holder*,
565 U.S. 42 (2011)........................................................................................................ 29

*Kingdom v. Trump*,
No. 25-cv-691, 2025 WL 1568238 (D.D.C. June 3, 2025)........................................... 36

*League of Women Voters v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......................................................................................... 34

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...................................................................................................... 12

*Mack Trucks, Inc. v. EPA*,
682 F.3d 87 (D.C. Cir. 2012) .............................................................................. 15, 16, 20

*Make the Road New York v. Noem*,
No. 25-5320, 2025 WL 3563313 (D.C. Cir. Nov. 22, 2025)........................................ 36

*Mansor v. USCIS*,
685 F. Supp. 3d 1000 (W.D. Wash. 2023)................................................................... 10

*Massachusetts v. EPA*,
   549 U.S. 497 (2007)............................................................................................. 12

*Mendoza v. Perez*,
   754 F.3d 1002 (D.C. Cir. 2014)........................................................................... 11

*Mexichem Specialty Resins, Inc. v. EPA*,
   787 F.3d 544 (D.C. Cir. 2015).............................................................................. 31

*Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*,
   463 U.S. 29 (1983)................................................................................... 24, 25, 29

*Natural Resources Defense Council v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) ............................................................................... 13

*National Lifeline Ass'n v. FCC*,
   921 F.3d 1102 (D.C. Cir. 2019)................................................................. 26, 27, 28

*National Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ............................................................................. 13

*National Venture Capital Ass'n v. Duke*,
   291 F. Supp. 3d 5 (D.D.C. 2017)............................................................... 14, 17, 18

*Neguse v. U.S. Immigration & Customs Enforcement*,
   No. 25-cv-2463, 2026 WL 575509 (D.D.C. Mar. 2, 2026) ..................................... 8

*New Jersey v. EPA*,
   626 F.2d 1038 (D.C. Cir. 1980)................................................................. 14, 15, 21

*New York Republican State Commission v. SEC*,
   927 F.3d 499 (D.C. Cir. 2019) ............................................................................... 9

*Nken v. Holder*,
   556 U.S. 418 (2009)....................................................................................... 8, 34

*Physicians for Social Responsibility v. Wheeler*,
   956 F.3d 634 (D.C. Cir. 2020)............................................................................. 28

*Public Citizen v. FAA*,
   988 F.2d 186 (D.C. Cir. 1993).............................................................................. 14

*Purdue University v. Scalia*,
   No. 20-cv-3006, 2020 WL 7340156 (D.D.C. Dec. 14, 2020) ........................... 14, 20

v

*Pursuing America's Greatness v. FEC*,
  831 F.3d 500 (D.C. Cir. 2016) .................................................................... 34

*Sagarwala v. Cissna*,
  No. 18-cv-2860, 2019 WL 1649943 (D.D.C. Apr. 16, 2019) ....................... 9

\**Sorenson Communications Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) .................................... 15, 16, 17, 18, 21, 27

*Spirit Airlines, Inc. v. U.S. Department of Transportation*,
  997 F.3d 1247 (D.C. Cir. 2021) ................................................................. 27

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...................................................................................... 8

*Sugar Cane Growers Co-op. of Florida v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ..................................................................... 12

*Southwest Airlines Co. v. FERC*,
  926 F.3d 851 (D.C. Cir. 2019) .............................................................. 28, 29

*Tennessee Gas Pipeline Co. v. FERC*,
  969 F.2d 1141 (D.C. Cir. 1992) ............................................................ 17, 19

*Texas v. Biden*,
  646 F. Supp. 3d 753 (N.D. Tex. 2022) ...................................................... 36

*United Steel v. Mine Safety & Health Administration*,
  925 F.3d 1279 (D.C. Cir. 2019) ................................................................. 28

*Utilities Solid Waste Activities Group v. EPA*,
  236 F.3d 749 (D.C. Cir. 2001) ...................................................... 15, 16, 17, 20

*Washington Alliance of Technology Workers v. DHS*,
  202 F. Supp. 3d 20 (D.D.C. 2016) ............................................................. 17

*West Deptford Energy, LLC v. FERC*,
  766 F.3d 10 (D.C. Cir. 2014) ..................................................................... 25

*West Virginia v. EPA*,
  577 U.S. 1126 (2016) .................................................................................. 36

*World Shipping Council v. Federal Maritime Commission*,
  152 F.4th 215 (D.C. Cir. 2025) .................................................................. 27

*Yassini v. Crosland*,
  618 F.2d 1356 (9th Cir. 1980) ..................................................................... 23

**Statutes**

*5 U.S.C. § 553(a)(1) ................................................................................. 14, 21

*5 U.S.C. § 553(b)(B) ................................................................................. 14, 15

5 U.S.C. § 553(b) ............................................................................................ 14

5 U.S.C. § 553(c) ............................................................................................ 14

*5 U.S.C. § 553(d) ................................................................................. 12, 14, 15

5 U.S.C. § 553(d)(3) ....................................................................................... 15

5 U.S.C. § 704 ................................................................................................ 13

5 U.S.C. § 705 ........................................................................... 1, 7, 33, 36

5 U.S.C. § 706(2)(A) ....................................................................................... 31

5 U.S.C. § 706(2)(D) ....................................................................................... 24

6 U.S.C. § 111(b)(1)(F) .................................................................................... 29

8 U.S.C. § 1101(a) .......................................................................................... 29

8 U.S.C. § 1103(a) ............................................................................................ 2

8 U.S.C. § 1182(a)(5) ...................................................................................... 29

8 U.S.C. § 1324a ......................................................................................... 3, 29

8 U.S.C. § 1324a(h)(3)(B) ................................................................................. 2

Pub. L. No. 119-21, § 100003(b)(1), 139 Stat. 73, 366 .................................. 26

**Rules**

Federal Rule of Civil Procedure 65(c) ............................................................. 37

**Regulations**

8 C.F.R. § 106.2(44) ....................................................................................... 20

8 C.F.R. § 274a.12(a)..................................................................................................2, 3

8 C.F.R. § 274a.12(b)....................................................................................................2

8 C.F.R. § 274a.12(c)....................................................................................................2

8 C.F.R. § 274a.13(a)....................................................................................................2

8 C.F.R. § 274a.13(c)....................................................................................................2

8 C.F.R. § 274a.13(d)....................................................................................................4

52 Fed. Reg. 16,216 (May 1, 1987)..............................................................................3

56 Fed. Reg. 41,767 (Aug. 23, 1991)............................................................................3

81 Fed. Reg. 82,398 (Nov. 18, 2016)..............................................................3, 4, 5, 29

87 Fed. Reg. 26,614 (May 4, 2022) ...................................................................4, 5, 29

89 Fed. Reg. 24,628 (Apr. 8, 2024) ........................................................................5, 29

*89 Fed. Reg. 101,208 (Dec. 13, 2024).........................................3, 5, 6, 17, 26, 28, 29

*90 Fed. Reg. 48,799 (Oct. 30, 2025).............................. 1, 5, 6, 11, 14, 16, 17, 18, 23, 26, 27, 31

**Legislative Material**

H.R. Rep. No. 79-1980 .................................................................................................23

S. Rep. No. 79-752........................................................................................................2

**Other Authorities**

Ass'n of American Medical Colleges, Comment on *Removal of the Automatic Extension of Employment Authorization Documents*, DHS Docket No. USCIS-2025-0271 (Dec. 1, 2025) ............................................................30

Asylum Seeker Advocacy Project (ASAP), Comment on *Removal of the Automatic Extension of Employment Authorization Documents*, DHS Docket No. USCIS-2025-0271 (Nov. 26, 2025),..............................................30

Department of Homeland Security, *Continuous Immigration Vetting* (Feb. 14, 2019)................18

Economic Policy Institute, Comment on *Removal of the Automatic Extension of Employment Authorization Documents*,
DHS Docket No. USCIS-2025-0271 (Dec. 1, 2025) ................................................................... 30

Human Rights First, Comment on *Removal of the Automatic Extension of Employment Authorization Documents*,
DHS Docket No. USCIS-2025-0271 (Dec. 1, 2025) ................................................................... 30

USCIS, *Case Processing Times, Form: I-765 | Application for Employment Authorization, Form Category: All Other Applications for Employment Authorization, Field Office or Service Center: Service Center Operations (SCOPS) as of May 12, 2026* .............................. 10

USCIS, *I-765, Application for Employment Authorization, Counts of Pending Petitions by Days Pending For All Eligibility Categories and (c)(8) Pending Asylum Category as of June 30, 2025* ....................................................................................................... 4

USCIS, *I-765, Application for Employment Authorization, Counts of Pending Petitions by Days Pending For All Eligibility Categories and (c)(8) Pending Asylum Category as of September 30, 2023* ........................................................................................... 10

USCIS, *I-765, Application for Employment Authorization, Counts of Pending Petitions by Days Pending For All Eligibility Categories and (c)(8) Pending Asylum Category as of September 30, 2025* ........................................................................................... 4

USCIS, *Policy Manual* ...................................................................................................... 19, 20

USCIS, *USCIS Increases Screening, Vetting of Aliens Working in United States* (Dec. 4, 2025) ..................................................................................................................... 26

**INTRODUCTION**

This case challenges an abrupt and unlawful reversal of a longstanding federal rule that allowed noncitizen workers to continue working while the government processed their applications for renewal of their work permits. For nearly a decade, U.S. Citizenship and Immigration Services (USCIS) recognized a simple reality: Its own backlogs for processing renewals should not strip individuals of the ability to work lawfully. The Interim Final Rule (IFR) at issue in this case, however, does exactly that.

On October 30, 2025, without warning or public input, USCIS eliminated automatic extensions of employment authorization documents (EADs) for hundreds of thousands of workers. *See* Removal of the Automatic Extension of Employment Authorization Documents, 90 Fed. Reg. 48,799 (Oct. 30, 2025). The consequences of this sweeping change are severe. Individuals who timely file applications to renew their EADs now face the sudden loss of work authorization, entirely due to agency backlogs. Plaintiff Jane Doe, who has worked legally in the United States for almost a decade and is the sole provider for her U.S. citizen daughter, is among them. If the IFR is allowed to remain in effect, she faces the imminent loss of her ability to support herself and her daughter, solely because the government has not yet acted on her pending renewal application.

The Administrative Procedure Act (APA) does not permit agencies to make such significant changes without following basic procedural safeguards and providing adequate reasoning. Here, USCIS bypassed notice-and-comment rulemaking by invoking the APA's "good cause" and "foreign affairs" exceptions. Those narrow exceptions, however, apply only in carefully circumscribed circumstances, which the agency has not come close to establishing here. USCIS also failed to offer a reasoned explanation grounded in evidence for issuance of a rule that will cause foreseeable and substantial injury to the workers, employers, and communities that relied on the previous rule.

1

Section 705 of the APA empowers the Court to prevent harm to Ms. Doe and thousands of workers like her—people who depend on an EAD to support themselves and their families—by preserving the status quo while the Court adjudicates the legality of USCIS's action. The law and the equities here overwhelmingly favor such relief, particularly because the harms threatened by the IFR cannot be undone at the end of this litigation. This Court should stay the effective date of the IFR and issue appropriate preliminary injunctive relief necessary to preserve the status quo ante and to provide EAD holders, like Ms. Doe, with the benefit of the stay.

## BACKGROUND

### A.    Statutory and Regulatory Framework Governing Employment Authorization

Congress has authorized the Secretary of Homeland Security to regulate employment authorization for noncitizens in the United States. *See* 8 U.S.C. §§ 1103(a), 1324a(h)(3)(B). Implementing that authority, Department of Homeland Security (DHS) regulations establish a comprehensive framework governing which noncitizens may work and under what conditions. *See* 8 C.F.R. § 274a.12(a)–(c). These regulations divide noncitizen workers into three categories: those authorized to work incident to status, those authorized for specific employers, and those who must apply for discretionary employment authorization. *Id.*

For individuals in discretionary categories—such as asylum applicants, adjustment-of-status applicants, and petitioners for immigration relief under the Violence Against Women Act (VAWA)—employment authorization is granted through the issuance of an EAD. *See id.* § 274a.12(c). To obtain or renew an EAD, applicants must file Form I-765, Application for Employment Authorization; submit supporting documentation; and undergo identity verification and security vetting. *See id.* §§ 274a.13(a), (c). EADs are issued for fixed validity periods, after which individuals must apply for renewal to maintain lawful employment. Because employers must verify work authorization under federal law and face penalties for employing unauthorized

workers, *see* 8 U.S.C. § 1324a, an expired EAD—even where an individual remains substantively eligible to work under 8 C.F.R. § 274a.12(a)—typically results in immediate loss of employment.

The relevant agencies have long recognized that delays in adjudicating EAD applications create a structural risk that eligible workers will lose employment solely due to agency inaction. In 1987, the Immigration and Naturalization Service (INS)—USCIS's predecessor—adopted regulations requiring the agency to adjudicate EAD applications within 60 days and to issue "interim" EADs where adjudication was delayed. 52 Fed. Reg. 16,216, 16,228 (May 1, 1987). In 1991, INS extended that agency adjudication deadline to 90 days, while maintaining the interim-EAD mechanism. 56 Fed. Reg. 41,767, 41,782 (Aug. 23, 1991). These early regulations reflect the government's recognition that, absent a regulatory safeguard, agency delay alone would cause otherwise eligible workers to lose their employment authorization—an outcome the government found unacceptable.

### B.    Persistent USCIS Backlogs and Adjudication Delays

Despite these early efforts, USCIS and its predecessor have struggled for decades with persistent processing delays in adjudicating EAD applications. USCIS has repeatedly acknowledged that renewal applications frequently remain pending well beyond the expiration date of an applicant's existing EAD. *See, e.g.*, 81 Fed. Reg. 82,398, 82,405–07 (Nov. 18, 2016); 89 Fed. Reg. 101,208, 101,210–11 (Dec. 13, 2024).

The backlog problem has worsened significantly in recent years. USCIS's own data confirms that adjudication delays are systemic and growing, even within the span of the six months that preceded the IFR. As of June 30, 2025, more than 165,000 EAD renewal applications had

3

been pending for more than 180 days.[1] By September 30, 2025, that number had more than doubled—with over 395,000 applications now pending for more than 180 days.[2] These figures demonstrate that prolonged adjudication is not an isolated occurrence but an entrenched feature of USCIS operations.

USCIS has attributed these delays to structural and operational constraints, including staffing shortages, increased vetting requirements, funding instability, and surges in application volume. *See* 87 Fed. Reg. 26,614, 26,617–18 (May 4, 2022). Regardless of cause, though, as the agency has consistently recognized, these delays create a foreseeable risk that eligible individuals will lose work authorization through no fault of their own.

**C.     Evolution of Regulatory Safeguards to Prevent Lapses in Work Authorization**

Recognizing the inadequacy of interim EADs to prevent employment gaps, USCIS undertook a major regulatory reform in 2016. After notice-and-comment rulemaking, the agency eliminated the 90-day adjudication deadline and interim EAD system, and replaced them with automatic extensions of work authorization for certain timely filed renewal applicants. 81 Fed. Reg. at 82,459–60. Under that rule, codified at 8 C.F.R. § 274a.13(d), individuals who (1) timely filed renewal applications and (2) sought renewal in the same category as their existing EAD received automatic extensions of up to 180 days or until the agency adjudicated the renewal application, whichever was earlier. 81 Fed. Reg. at 82,491. USCIS explained that this approach better aligned with operational realities and avoided penalizing applicants for agency delay. *Id.* at

---

[1] USCIS, *I-765, Application for Employment Authorization, Counts of Pending Petitions by Days Pending For All Eligibility Categories and (c)(8) Pending Asylum Category as of June 30, 2025*, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.

[2] USCIS, *I-765, Application for Employment Authorization, Counts of Pending Petitions by Days Pending For All Eligibility Categories and (c)(8) Pending Asylum Category as of September 30, 2025*, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data.

82,460. The agency also extended the renewal filing window from 120 to 180 days before expiration, creating a potential buffer of up to 360 days. *Id.* at 82,457.

Despite the 2016 rule, backlogs worsened, forcing many individuals with pending renewal applications to fall out of the authorized workforce. In May 2022, USCIS issued a temporary final rule extending automatic renewal periods to up to 540 days. 87 Fed. Reg. at 26,614. The agency explained that the 180-day extension was "insufficient" given median processing times approaching eight months and documented lapses affecting tens of thousands of workers. *Id.* at 26,617–18. USCIS reiterated these findings in April 2024, when it issued another temporary final rule extending automatic renewals to up to 540 days in light of continued delays that threatened hundreds of thousands of workers with loss of employment authorization. 89 Fed. Reg. 24,628, 24,629–30, 24,634 (Apr. 8, 2024).

In December of that year, after notice-and-comment rulemaking, USCIS adopted the 540-day automatic extension in a final rule. 89 Fed. Reg. 101,208 (Dec. 13, 2024). In issuing the final rule, USCIS emphasized that prolonged adjudication delays were systemic and that automatic extensions were necessary to prevent "substantial and unnecessary" harm to workers, families, employers, and the broader economy. *Id.* at 101,210–12. The agency estimated that temporary extensions had already prevented lapses for hundreds of thousands of workers and stabilized billions of dollars in wages and economic activity. *Id.* Importantly, USCIS acknowledged that even a 540-day extension would not fully eliminate lapses, estimating that tens of thousands of individuals would still lose work authorization due to persistent backlogs. *Id.* at 101,265.

**D.    The 2025 Interim Final Rule**

On October 30, 2025, USCIS abruptly reversed course. Without notice, the agency issued an IFR eliminating automatic extensions of employment authorization. 90 Fed. Reg. 48,799 (Oct. 30, 2025). The IFR went into effect immediately, making it applicable to all renewal applications

filed on or after its publication date. *Id.* at 48,799–48,800. Under the IFR, an individual's work authorization terminates on the expiration date printed on the EAD, regardless of whether a timely renewal application is pending or how long USCIS takes to adjudicate it.

In promulgating the IFR, USCIS acknowledged that adjudication delays persist and that applicants may lose work authorization as a result. *Id.* at 48,817. The agency further recognized that such lapses would cause "lost compensation to workers," employer turnover costs, and broader economic disruption. *Id.* Nonetheless, USCIS concluded that eliminating automatic extensions was necessary to promote "program integrity" and protect "national security." *Id.* at 48,806–07.

To bypass notice-and-comment rulemaking, USCIS invoked the APA's good cause and foreign affairs exceptions. *Id.* at 48,812–16. USCIS separately contended that it had good cause to skip the APA's general requirement that substantive rules only go into effect thirty days after publication. *Id.* at 48,812. The agency asserted that automatic extensions allow individuals to continue working before completion of vetting and could pose security risks, despite having previously characterized such risks as speculative. *Compare id.* at 48,815, *with* 89 Fed. Reg. at 101,226. The IFR thus represents a sharp departure from nearly a decade of consistent agency policy recognizing that automatic extensions are necessary to mitigate the known and ongoing consequences of USCIS's processing delays.

### E.    Plaintiff Jane Doe

Plaintiff Jane Doe is a 39-year-old who has lived in the United States for nearly a decade and is the sole caregiver and financial provider for her eight-year-old daughter, a U.S. citizen. Doe Decl. ¶¶ 2, 18–22. Ms. Doe has lawfully worked in the United States for years pursuant to EADs issued by USCIS. Ms. Doe currently holds an EAD linked to her approved petition for immigration relief under VAWA. *Id.* ¶¶ 9, 12. That EAD is valid through June 23, 2026. *Id.* ¶ 12. Due to concerns about USCIS delays, Ms. Doe timely filed her renewal application on November 19,

2025—more than seven months before its expiration. *Id.* ¶ 14. USCIS has not yet adjudicated her work permit renewal application. *Id.* ¶ 17.

In the past, the automatic extension of EADs enabled Ms. Doe to maintain her ability to work and provide for her family, despite USCIS backlogs. Specifically, when she timely applied to renew her EAD in November 2023, USCIS did not adjudicate her application until the following June—three months *after* her EAD would have expired absent the automatic extension. *Id.* ¶¶ 10– 12. The extension allowed her to maintain continuous employment for those critical months. *Id.* ¶¶ 10–11. This time, however, because she applied a few weeks after the IFR, Ms. Doe did not receive an automatic extension upon submitting her timely renewal application. *Id.* ¶ 15. She thus faces imminent risk of losing her ability to work legally in the United States.

Ms. Doe works three jobs—as a Spanish-English interpreter, substitute teacher, and tutor— and her employment depends on maintaining valid work authorization. *Id.* ¶¶ 18–21. She is a single mother and the sole breadwinner for her household. *Id.* ¶ 22. Ms. Doe's income supports her young daughter, pays for her housing, and maintains her eligibility for childcare and health insurance subsidies. *Id.* ¶¶ 22–24. If her work authorization lapses, she will immediately lose her income and essential benefits. *Id.* ¶¶ 23–24. Because USCIS processing times routinely exceed the validity period of EADs—and because hundreds of thousands of applications remain pending for more than 180 days—Ms. Doe faces a substantial and imminent risk that her work authorization will expire before USCIS adjudicates her renewal application.

## LEGAL STANDARDS

Section 705 of the APA authorizes a court to "postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id.* The factors governing issuance of a Section 705 stay and those

that govern the grant of a preliminary injunction are the same. *See District of Columbia v. USDA*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020); *Neguse v. U.S. Immigr. & Customs Enf't*, No. 25-cv-2463, 2026 WL 575509, at *6 (D.D.C. Mar. 2, 2026). Under those standards, the moving party must show that (1) she has substantial likelihood of success on the merits, (2) she would suffer irreparable injury if the relief were denied, (3) other interested parties would not be substantially harmed if the relief were granted, and (4) the public interest would be furthered by the relief. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The third and fourth factors—harm to other parties and the public interest—merge when the federal government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

## I.    Ms. Doe is likely to succeed on the merits.

### A.    Ms. Doe has standing.

To secure a Section 705 stay or other preliminary relief, a plaintiff is required to "show a substantial likelihood of standing.'" *Cabrera v. U.S. Dep't of Lab.*, 792 F. Supp. 3d 91, 101 (D.D.C. 2025) (quoting *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017)). To establish standing, a plaintiff must demonstrate a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338–39 (2016). Ms. Doe has made that showing here.

**1.** Ms. Doe has standing to pursue her substantive claims. As a direct result of the IFR, Ms. Doe faces the imminent risk of losing her legal authorization to work in the United States. *See* Doe Decl. ¶¶ 12, 14–15. Without the ability to work and earn income, Ms. Doe will not be able to provide for her and her daughter's needs. *Id.* ¶¶ 18–24. The loss of work authorization and the attendant loss of income constitute classic economic injuries that courts have long recognized as

sufficient for standing. *See, e.g.*, *Sagarwala v. Cissna*, No. 18-cv-2860, 2019 WL 1649943, at *1 (D.D.C. Apr. 16, 2019) (holding that plaintiff's "loss of her lawful ability to work in this country" was "an injury-in-fact"); *Air Line Pilots Ass'n, Int'l v. Chao*, 889 F.3d 785, 789 (D.C. Cir. 2018) (identifying "potential job loss" as injury for standing purposes); *cf. Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Moreover, Ms. Doe's injury is not speculative: She is eligible for renewal, her renewal application has been pending for more than five months, and absent relief, she will lose her ability to work upon the expiration of her current EAD on June 23, 2026. That imminent risk is sufficient to confer standing. As the D.C. Circuit has explained, "a plaintiff is not limited to establishing injury-in-fact by showing that a harm is certainly impending; [she] may instead show a substantial risk that the anticipated harm will occur." *New York Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019) (cleaned up). Courts thus evaluate whether the risk of the ultimate injury renders that harm sufficiently imminent. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017). Ms. Doe easily meets this standard. She faces a "substantial risk" of the loss of her legal authorization to work in just a few weeks' time, and, with it, the sole basis for her employment and income. *See* Doe Decl. ¶¶ 12, 14–15, 18–24. Recognition of her imminent injury "requires only the single inference" that USCIS will act in a predictable fashion by failing to adjudicate her renewal application before June 23. *New York Republican State Comm.*, 927 F.3d at 505. This single inference is "eminently reasonable—indeed, irresistible," *id.*, given the agency's own data documenting its severe backlog in adjudicating EAD renewals. *See supra* notes 1 and 2. Ms. Doe already experienced the effects of this backlog firsthand when USCIS took more than seven months to adjudicate her previous EAD renewal application. *See* Doe Decl. ¶¶ 10–12. And

9

USCIS's backlog today is substantially worse than it was when Ms. Doe last applied for renewal.[3] Current processing times confirm the same reality: At the relevant service center, 20 percent of EAD application cases in Ms. Doe's category are still pending 11.5 months after filing.[4] USCIS is thus exceedingly unlikely to adjudicate her application until well after her EAD expires.

Courts have recognized that this type of injury—predictable loss of employment and work authorization due to agency delay—is sufficiently concrete and imminent to support standing. Rules that "make it harder, and in some cases impossible" to maintain EADs directly compromise the ability of noncitizen workers to "earn income" and "access[] many other services." *Asylumworks v. Mayorkas*, No. 20-cv-3815, 2021 WL 2227335, at *6 (D.D.C. June 1, 2021). Thus, another district court has held that plaintiffs in a substantially similar posture to Ms. Doe "plausibly alleged 'imminent' injuries … by establishing that their EADs are likely to expire before USCIS adjudicates their … applications," emphasizing that a plaintiff "does not have to await the consummation of threatened injury to obtain preventative relief." *Mansor v. USCIS*, 685 F. Supp. 3d 1000, 1009 (W.D. Wash. 2023). The same is true here. Ms. Doe applied for renewal well in advance of her expiration date, precisely because she feared agency delay; yet, unlike in prior years, she received no automatic extension of her work authorization. Her injury is therefore not hypothetical—it is imminent and substantial.

---

[3] *Compare supra* note 2, *with USCIS, I-765, Application for Employment Authorization, Counts of Pending Petitions by Days Pending For All Eligibility Categories and (c)(8) Pending Asylum Category as of September 30, 2023*, https://www.uscis.gov/sites/default/files/document/data/i765_p_allcat_c08_fy2023q4.pdf (noting that just over 279,000 renewal applications had been pending for 180 days or more as of the end of September 2023).

[4] USCIS, *Case Processing Times*, Form: I-765 | *Application for Employment Authorization, Form Category: All Other Applications for Employment Authorization, Field Office or Service Center: Service Center Operations (SCOPS) as of May 12, 2026*, https://egov.uscis.gov/processing-times/; *see also* Doe Decl. ¶ 16 (identifying SCOPS as the relevant place for processing of C31 EAD renewal).

Ms. Doe easily meets the other elements of standing. Her injury is directly traceable to the IFR, which eliminates the automatic extension that would otherwise preserve her work authorization for a further 540 days, until December 15, 2027. *See* 90 Fed. Reg. at 48,811, 48,820. And it is redressable because vacatur of the IFR would restore the prior regulatory regime under which her work authorization would remain valid for up to 540 days while her application is pending. *See Cato Inst. v. SEC*, 4 F.4th 91, 94–95 (D.C. Cir. 2021). That relief would allow Ms. Doe to keep working until USCIS processes her renewal request—eliminating the injury she would otherwise imminently face.

**2.** Ms. Doe also has standing to pursue her procedural claim based on USCIS's failure to provide notice and an opportunity for comment before issuing the IFR. "The Court's standing inquiry is slightly different when a plaintiff seeks to vindicate a procedural right, such as having been unlawfully denied the opportunity to comment on a proposed rule." *Cap. Area Immigrants' Rts. Coal. v. Trump* (*CAIR Coal.*), 471 F. Supp. 3d 25, 37–38 (D.D.C. 2020) (citing *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014)). "Specifically, a plaintiff asserting a procedural violation must show a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to [her] particularized interest." *Id*. (internal quotation marks and citation omitted). Ms. Doe easily satisfies that requirement as the IFR both deprived her of the opportunity to participate in the APA rulemaking process and places her at substantial risk of losing her work authorization—and with it, her income and ability to support her family. *See supra* at 6–7.

The elimination of automatic extensions, promulgated without notice and comment, and made immediately effective upon the IFR's publication in the Federal Register, directly increases the risk that Ms. Doe's work authorization will lapse before USCIS adjudicates her renewal.

11

Because Ms. Doe applied to renew her EAD just three weeks after the IFR's promulgation, she would not have been subject to USCIS's new rule had the agency used notice-and-comment rulemaking and heeded the APA's general requirement that a regulation be published "not less than 30 days before its effective date," 5 U.S.C. § 553(d). Moreover, Ms. Doe need not demonstrate that proper procedures would have changed the substantive outcome of the rulemaking. *See Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 94 (D.C. Cir. 2002). Instead, "[a]ll that is necessary is to show that the procedural step was connected to the substantive result." *Id.* at 94–95; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). Here, the absence of notice and comment is directly connected to USCIS's decision to eliminate automatic extensions, which in turn threatens Ms. Doe's work authorization.

Once injury and causation are established, the doctrine of procedural standing "relax[es] … the issues of imminence and redressability." *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021). In this context, a plaintiff "has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). Vacatur of this IFR would require USCIS to revisit its rulemaking in a procedurally proper manner. And were the agency to attempt to promulgate the rule once again with notice and comment, Ms. Doe and other members of the public could submit comments and evidence bearing directly on the consequences of eliminating automatic extensions. There is, at minimum, "some possibility" that such reconsideration would lead the agency to retain or reinstate measures that would prevent a lapse in Ms. Doe's work authorization.

**B.      Ms. Doe is likely to succeed on the merits of her claims.**

**1.      The IFR is final agency action.**

The APA provides for review of "final agency action." 5 U.S.C. § 704. Agency action is final where it (1) marks the consummation of the agency's decisionmaking process and (2) is an action by which rights or obligations have been determined or from which legal consequences flow. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). The IFR satisfies both requirements. First, an interim rule "marks the consummation of the agency's decisionmaking … unless and until it is superseded." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 80 (D.C. Cir. 2020). The IFR is thus "the final word from the agency on what will happen up to the time of any different permanent decision." *Id.* at 78. Second, the IFR changed the legal effect of all receipt notices for EAD renewal applications filed after the IFR was published: Before, they operated to extend the expiration date on certain applicants' EADs; now, they do not. As a consequence, individuals with pending EAD renewal applications will immediately be forced out of the workforce upon the expiration of their current work permits. Agency actions with such binding legal and practical consequences are final for purposes of APA review. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (explaining that finality turns on the legal effect of the action on regulated parties).

**2.      The IFR was issued without procedure required by law.**

"Under the APA, whenever agencies promulgate a rule that intends to create new law, rights, or duties … they must engage in a process known as notice-and-comment rulemaking." *Bloomberg L.P. v. SEC*, 45 F.4th 462, 476 (D.C. Cir. 2022) (citation omitted; alteration in original). Notice-and-comment rulemaking requires an agency to "give the public '[g]eneral notice of [a] proposed rule making' by publication in the Federal Register" and to "provide 'interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments' regarding the proposed rule." *Dep't of Educ. v. Brown*, 600 U.S. 551, 557–58 (2023)

13

(quoting 5 U.S.C. §§ 553(b), (c)). In addition, the APA requires that a substantive rule generally must be published "not less than 30 days before its effective date." 5 U.S.C. § 553(d).

These requirements are not a formality. They "are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule." *Int'l Union, United Mine Workers v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Public participation also assists regulators in remaining "factually well informed" and "hav[ing] the benefit of alternative solutions that commenters may suggest." *Am. Fed'n of Lab. & Cong. of Indus. Orgs. v. NLRB*, 57 F.4th 1023, 1034 (D.C. Cir. 2023). And in the event of a subsequent challenge to the rule, the agency's responses to public comments enable courts "to see what major issues of policy were ventilated … and why the agency reacted to them as it did." *Public Citizen v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 335 (D.C. Cir. 1968)).

The limited exceptions to these requirements are "narrowly construed and only reluctantly countenanced." *New Jersey v. EPA*, 626 F.2d 1038, 1045 (D.C. Cir. 1980). USCIS purported to invoke two exceptions here: It asserted that the agency "for good cause" found notice and comment "impracticable, unnecessary, or contrary to the public interest," 5 U.S.C. § 553(b)(B), and that the rule involves a "foreign affairs function of the United States," *id.* § 553(a)(1). *See* 90 Fed. Reg. at 48,812–16. "[T]he onus is on the agency," though, "to establish that notice and comment should not be given." *Purdue Univ. v. Scalia*, No. 20-cv-3006, 2020 WL 7340156, at *6 (D.D.C. Dec. 14, 2020) (cleaned up); *see Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5, 16 (D.D.C. 2017) (same); *Am. Fed'n of Gov't Emp., AFL-CIO (AFGE) v. Block*, 655 F.2d 1153, 1155–56 (D.C. Cir. 1981) (noting that an agency may only "avoid its 553(d) notice obligation 'for good cause found

14

and published with the rule'" (quoting 5 U.S.C. § 553(d))). USCIS has failed to meet its burden to bypass notice-and-comment rulemaking here.

### a. Defendants did not have good cause to skip notice-and-comment rulemaking or to make the IFR effective immediately.

Ms. Doe is likely to succeed in showing that the APA's good cause exception does not justify USCIS's failure to engage in notice-and-comment rulemaking or its decision to make the IFR effective immediately. Under this exception, an agency may dispense with notice-and-comment procedures where it "for good cause finds … that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B); *see id.* § 553(d)(3) (providing exception to 30-day delay in effective date "for good cause found"). Good cause, however, is "*not* [an] escape clause[] that may be arbitrarily utilized at the agency's whim"; it is instead reserved for truly exceptional circumstances, typically involving emergencies or situations in which delay of a rule's implementation would cause real, concrete harm. *AFGE*, 655 F.2d at 1156; *see also Util. Solid Waste Activities Grp. v. EPA*, 236 F.3d 749, 754 (D.C. Cir. 2001) (recognizing that exception's "use should be limited to emergency situations" (internal quotation marks omitted)).

USCIS bears a heavy burden to justify its use of the exception, as "the D.C. Circuit has set a high bar for satisfying good cause." *CAIR Coal.*, 471 F. Supp. 3d at 45; *see New Jersey*, 626 F.2d at 1045. This Court reviews an agency's finding of good cause de novo, *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 706 (D.C. Cir. 2014), affording the agency "no particular deference," *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012). The judicial inquiry is "meticulous and demanding"—particularly where the agency's reasoning is "potentially capacious." *Sorenson*, 755 F.3d at 706. Here, USCIS's purported justification does not come close to meeting that exacting standard. The agency identifies no genuine emergency, relies on speculative assertions of harm,

and improperly invokes hypothetical behavioral responses to justify bypassing notice and comment for a rule with substantial impact.

In issuing the IFR, USCIS asserted that notice-and-comment rulemaking would be impracticable. *See* 90 Fed. Reg. at 48,813. To show that notice-and-comment procedures are "impracticable," however, an agency must demonstrate that "due and timely execution of its functions would be impeded," *Util. Solid Waste*, 236 F.3d at 754, or that delay would "would imminently threaten life or physical property," *Sorenson*, 755 F.3d at 706; *see Mack Trucks*, 682 F.3d at 93. In *Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004), for instance, the D.C. Circuit found good cause where the agencies in question, the Federal Aviation Administration and Transportation Security Administration, faced a concrete and immediate security threat in the aftermath of the September 11, 2001, terror attacks. *Id*. at 1179. In those unusual circumstances, the court agreed, notice and comment would "delay the ability … to take effective action" necessary "to prevent a possible imminent hazard to aircraft, persons, and property." *Id.*

USCIS identified no exigent circumstances here. Instead, it relied on generalized concerns about vetting and "program integrity" associated with automatic extensions; assertions that automatic extensions may allow individuals to continue working before completion of background checks; predictions that derogatory information might be uncovered during adjudication; claims that individuals could "generate income to potentially finance nefarious activities"; and allegations that the system may be vulnerable to fraud or misuse if employment authorization continues during the pendency of renewal applications. 90 Fed. Reg. at 48,813. But these concerns range from unsupported to implausible. And to the extent that USCIS could substantiate them, the concerns would not justify hurried action, as they would arise out of inherent features of a regulatory framework that has existed for nearly a decade and that USCIS has repeatedly expanded, including

16

as recently as ten months prior to the IFR's issuance. *See* 89 Fed. Reg. at 101,208. Courts in this Circuit have rejected assertions of good cause where the purported urgency stems from longstanding conditions rather than a true emergency. *See, e.g.*, *Util. Solid Waste*, 236 F.3d at 755 (finding good cause lacking where the agency offered no indication that an existing regulatory regime "posed any threat to environment or human health or that some sort of emergency had arisen"); *Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 19 (holding that the agency could not rely on ordinary policy considerations such as administrative burden, stakeholder confusion, or implementation costs to justify failure to comply with notice-and-comment); *Washington All. of Tech. Workers v. DHS*, 202 F. Supp. 3d 20, 26 (D.D.C. 2016) (finding that DHS lacked good cause where it "offered nothing concrete to substantiate its claims," "did nothing to quantify the economic impact of delaying a rule," and "had been aware of the problem for years and had nonetheless failed to take action").

Moreover, the facts that USCIS offered to support the IFR are "simply too scant," *Sorenson*, 755 F.3d at 707, to establish an emergency related to "program integrity" or any risk posed by allowing "unvetted" renewal applicants to continue working while their applications are pending. The D.C. Circuit has emphasized that agencies must offer "record support proving the emergency"; "something more than an unsupported assertion is required." *Sorenson*, 755 F.3d at 707 (rejecting good cause where agency lacked factual support for claimed harm); *see Tenn. Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1145 (D.C. Cir. 1992) (rejecting agency prediction of harm where it had "provided little factual basis" and relied on only a "thin reed" of evidence). USCIS has not offered the necessary support here. The agency asserted that automatic extensions create a "security vulnerability" because individuals may receive continued work authorization before vetting is complete. 90 Fed. Reg. at 48,813. USCIS failed to acknowledge, however, that it is

17

capable of continuously vetting benefit applicants, even without a triggering event, such as the submission of a renewal application.[5]

USCIS further speculated that individuals working under an extended EAD could "generate income to potentially finance nefarious activities," and it characterized a single, violent incident perpetrated by an asylum applicant in Boulder, Colorado, as evidence of an "immediate risk" posed by noncitizens. 90 Fed. Reg. at 48,813. But USCIS provided no data showing that automatic extensions have led to criminal activity, no evidence that renewal applicants pose heightened risks, and no connection between the Boulder incident and work permits, much less automatic extensions. While the individual who perpetrated the Boulder incident apparently had an expired EAD, USCIS did not say whether he applied for renewal. And regardless of whether he had, eliminating automatic extensions would not have prevented the incident: The expiration of an EAD does not itself result in or change a noncitizen's eligibility for removal from the United States. USCIS thus relied on an anecdote that bears no connection to the previous rule providing for automatic extensions of EADs to issue an IFR depriving thousands of law abiding, eligible workers of employment authorization. Without any "factual findings supporting the reality of [a] threat" posed by the earlier rule, this rationale was insufficient as a matter of law to support USCIS's assertion of good cause. *Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 18 (quoting *Sorenson*, 755 F.3d at 706).

USCIS also claimed that notice-and-comment procedures would have triggered a "flood" of renewal applications as individuals sought to obtain automatic extensions before a new rule took effect. Courts, however, have squarely rejected attempts to invoke good cause based on

---

[5] *See generally Continuous Immigration Vetting*, Dep't of Homeland Sec. (Feb. 14, 2019), https://www.dhs.gov/sites/default/files/publications/pia-uscis-fdnsciv-february2019_0.pdf.

speculative predictions that regulated parties will act to take advantage of existing rules. In *CAIR Coalition*, for example, the government similarly argued that notice of a rule restricting asylum eligibility would prompt a surge of migrants to enter the United States before the rule's effective date—in other words, that individuals would accelerate their conduct to qualify under the existing legal regime before it changed. 471 F. Supp. 3d at 46. The district court held that such reasoning could not satisfy the D.C. Circuit's standard absent concrete evidence in the administrative record demonstrating that the anticipated behavioral response would be sufficiently severe and harmful to justify bypassing notice and comment. *Id.* at 49. Likewise, in *Tennessee Gas Pipeline*, the D.C. Circuit rejected an agency's claim that regulated entities would rush to evade a forthcoming rule, emphasizing that predictive judgments about regulated parties' behavior must be supported by evidence, not conjecture. 969 F.2d at 1145–46.

Here, USCIS offered no empirical support for its prediction of a "flood" of applications, no analysis of its magnitude, and no explanation why it would rise to the level of an emergency. Meanwhile, several features of the EAD renewal system undermine the plausibility of USCIS's prediction. As USCIS's Policy Manual makes clear, applicants who file to renew more than six months early generally receive an EAD that is effective from the date of issuance—not backdated to run consecutively from the expiration of the prior EAD.[6] As a result, renewing earlier than the agency recommends does not extend the overall duration of work authorization; it merely shifts the validity period forward, effectively "burning" time on the existing EAD and substantially diminishing any incentive to file renewal applications prematurely. For that reason, people with

---

[6] USCIS, *Policy Manual*, Vol. 10, Pt. A, Ch. 4, https://www.uscis.gov/policy-manual/volume-10-part-a-chapter-4 ("If an alien files for a renewal EAD more than 180 days before the current EAD expires and USCIS approves such request, USCIS generally does not backdate or postdate the renewal EAD in relation to the current EAD's validity period.").

more time left on their existing EAD have incentive *not to* submit an early renewal application. And for many applicants, the costs of filing—in terms of fees and administrative burden—serve as a deterrent to attempting to secure an automatic extension earlier than necessary. *See* 8 C.F.R. § 106.2(44) (noting filing fees).[7] These structural features render implausible USCIS's prediction of a "flood" of individuals filing early renewal applications in order to take advantage of the automatic extension. Although "[c]ommon sense dictates" that some anticipatory behavior may occur, that alone cannot constitute good cause. *CAIR Coal.*, 471 F. Supp. 3d at 46.

USCIS likewise has not established that forgoing notice-and-comment procedures was in the public interest. The "public interest" prong of the good cause exception is satisfied only in the "rare circumstance" where notice-and-comment procedures—ordinarily presumed to serve the public interest—would in fact cause concrete harm. *Mack Trucks*, 682 F.3d at 95; *see Purdue Univ.*, 2020 WL 7340156, at \*10. Courts have found this standard met only where the "timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal," *Mack Trucks*, 682 F.3d at 95—for example, where "announcement of a proposed rule would enable the sort of financial manipulation the rule sought to prevent," *Util. Solid Waste*, 236 F.3d at 755, or where advance notice and delay would undermine the effectiveness of a security measure and expose the public to imminent safety risks, *see Jifry*, 370 F.3d at 1179. USCIS has not made that showing. Its claims of harm are speculative, and it fails entirely to grapple with the substantial countervailing harms that immediate implementation will cause—the loss of employment and income for renewal-eligible individuals who have timely submitted renewal applications.

---

[7] USCIS, *Policy Manual*, Vol. 1, Pt. B, Ch. 3, https://www.uscis.gov/policy-manual/volume-1-part-b-chapter-3 ("Fees submitted to USCIS are generally non-refundable regardless of the ultimate decision on the benefit request[.]").

Finally, the scope of the IFR underscores the absence of good cause. The D.C. Circuit has emphasized that "[t]he more expansive the regulatory reach … the greater the necessity for public comment." *AFGE*, 655 F.2d at 1156; *see CAIR Coal.*, 471 F. Supp. 3d at 45 (applying this principle in the immigration context). Allowing USCIS to invoke good cause to bypass notice-and-comment procedures for a rule that impacts hundreds of thousands of people lawfully working in the United States would "run afoul of congressional intent" and undermine the APA's core protections. *See Sorenson*, 755 F.3d at 706.

Put simply, USCIS has not identified an emergency, has relied on speculative assertions of harm and hypothetical behavioral responses, and has failed to demonstrate that notice-and-comment procedures would harm the public interest. Ms. Doe is therefore likely to succeed on her claim that the IFR does not fall within the good cause exception to notice-and-comment rulemaking.

> **b. The foreign affairs exception does not justify Defendants' issuance of the IFR without providing an opportunity for notice and comment.**

Defendants fare no better with their claim that the APA's foreign affairs exception justifies bypassing notice-and-comment rulemaking. Like the good cause exception, this exception is narrowly construed and reluctantly countenanced. *See CAIR Coal.*, 471 F. Supp. 3d at 52 (citing *New Jersey*, 626 F.2d at 1045); *City of New York v. Permanent Mission of India*, 618 F.3d 172, 201 (2d Cir. 2010) (same); *Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983) (same). The exception applies only "to the extent that there is involved … a military or foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). And it applies only where the rule itself—not its downstream effects—"clearly and directly" involves activities characteristic of the conduct of international relations. *CAIR Coal.*, 471 F. Supp. 3d at 52 (quoting *Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978)).

In light of these limitations, courts in this district have consistently rejected application of the exception merely because a rule concerns immigrants. For instance, in *CAIR Coalition*, the court considered a challenge to an interim final rule that barred asylum eligibility for certain migrants who failed to seek protection in third countries before reaching the United States—a rule the government justified in part as facilitating ongoing diplomatic negotiations and advancing foreign policy objectives. 471 F. Supp. 3d at 31, 56. The court rejected the government's invocation of the exception, explaining that a rule must clearly and directly involve "activities or actions characteristic to the conduct of international relations," not merely implicate foreign affairs or have "indirect international effects." *Id.* at 53, 55. Similarly, in *E.B. v. U.S. Department of State*, 583 F. Supp. 3d 58 (D.D.C. 2022), the court made clear that "any speculative, indirect effect" on diplomacy "does not clear the high bar necessary to dispense with notice-and-comment rulemaking." *Id*. at 67. In the immigration context in particular, the court warned, "the dangers of an expansive reading of the foreign affairs exception … are manifest." *Id.* (quoting *City of New York*, 618 F.3d at 202).

The IFR here is far removed from "heartland cases in which the rule itself directly involves the conduct of foreign affairs"—which is all "the foreign affairs function covers." *Id.* For example, in the sole case in which the D.C. Circuit has applied the exception, *International Brotherhood of Teamsters v. Peña*, 17 F.3d 1478 (D.C. Cir. 1994), the court recognized that a foreign affairs function was implicated where a rule merely implemented preexisting treaty obligations. The challenged rule in that case implemented a bilateral Memorandum of Understanding between the United States and Mexico regarding reciprocal recognition of commercial drivers' licenses, and it "d[id] no more than carry out" the United States' "obligations to a foreign nation," *id*. at 1486, by simply "adding a sentence to [a] footnote" in a regulation, *id.* at 1481. Some courts have also found

22

rules that address foreign diplomats or foreign sovereign conduct sufficient to trigger the exemption. *City of New York*, for instance, concerned a rule addressing the tax treatment of foreign-government-owned property used for diplomatic housing. 618 F.3d at 202. The Second Circuit held that the foreign affairs exception applied because the rule "implicate[d] matters of diplomacy directly" and was grounded in international reciprocity. *Id*.

By contrast, the IFR in no way concerns interactions with foreign sovereigns or diplomats. Rather, it regulates whether certain individuals already present and lawfully working in the United States may continue working while their renewal applications are pending. The IFR thus involves a quintessentially domestic administrative function "(1) taking place in the United States, (2) relating to individuals who are present here, and (3) applying U.S. law." *Amica Ctr. for Immigrant Rts. v. Exec. Off. for Immigr. Rev.*, No. 26-cv-696, 2026 WL 662494, at *31 (D.D.C. Mar. 8, 2026). Although USCIS attempts to characterize employment authorization as "inherent to the control of an alien's status" and therefore part of foreign affairs, 90 Fed. Reg. at 48,814, courts have consistently rejected such an overbroad reading of the exception. The exception cannot be interpreted "loosely … to mean any function" that arguably extends "beyond the borders of the United States." *City of New York*, 618 F.3d at 202 (quoting S. Rep. No. 79-752, at 13 (1945) and citing H.R. Rep. No. 79-1980, at 23 (1946)). Otherwise, any rule concerning immigration matters would be exempt from the procedural requirements of the APA. *See Amica Ctr. for Immigrant Rts.*, 2026 WL 662494, at *31; *cf. Yassini v. Crosland*, 618 F.2d 1356, 1360 n.4 (9th Cir. 1980) (noting that the foreign affairs exception would become "distended" if applied generally to immigration-related agency actions).

USCIS relies on executive orders and a State Department determination that broadly defines immigration-related actions as foreign affairs functions. As Judge Kelly's reasoning in

23

*E.B.* underscores, however, the foreign affairs exception's application turns on the "relationship of the *rule* to activities or actions characteristic of international relations, not the relationship of the *program* affected by the rule." 583 F. Supp. 3d at 66 (emphases added); *see also id.* at 67 ("Congress's use of the word 'function'—instead of, say, 'effects' or 'implications'—prevents the foreign affairs function exception from swallowing the rule."). That the IFR might align with broader foreign policy objectives does not transform a domestic employment authorization rule into one that "clearly and directly" involves foreign affairs. "[D]ownstream effects on foreign affairs or negotiations with other countries—either positive or negative—do not bring the Rule under this exception." *CAIR Coal.*, 471 F. Supp. 3d at 57.

USCIS's invocation of the foreign affairs exception ultimately rests on arguments that courts in this district have repeatedly rejected: generalized references to foreign policy, speculative predictions of international consequences, and an overbroad conception of what constitutes a "foreign affairs function." Because USCIS has failed to demonstrate that the IFR "clearly and directly" involves the conduct of foreign affairs, Ms. Doe is likely to succeed on her claim that the agency unlawfully dispensed with required procedures in violation of 5 U.S.C. § 706(2)(D).

### 3. The IFR is arbitrary and capricious.

Ms. Doe is also likely to succeed on the merits of her claim that the IFR violates the APA's requirement of reasoned decisionmaking. Agency action is arbitrary and capricious when the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Moreover, when an agency reverses course, it must provide a reasoned explanation that accounts for "serious reliance interests" engendered by the prior rule. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020);

24

*see West Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014) (stating that an agency "must provide a reasoned explanation for departing from precedent or treating similar situations differently" (cleaned up)). The IFR does not meet these requirements. Instead, USCIS ignored important aspects of the problem it purported to address; relied on speculative and unsupported reasoning; contravened its statutory obligation to safeguard economic stability; and eliminated a longstanding system to ensure work permit continuity under which hundreds of thousands of individuals and their employers have structured their lives and affairs.

To start, USCIS "entirely failed to consider an important aspect of the problem": its own processing delays. *See State Farm*, 463 U.S. at 43. The issue that the prior automatic extension rule was designed to address—one that USCIS itself repeatedly acknowledged—is the agency's inability to adjudicate timely filed renewal applications before EAD expiration dates. The IFR conceded that such delays persist, yet it eliminated the only mechanism that prevents those delays from causing immediate and substantial harm to applicants. USCIS offered no coherent explanation for that perplexing decision. That omission is particularly glaring given that the prior regime existed for the very purpose of mitigating the precise harms—processing delays and workforce disruption—that the agency has since chosen to ignore.

The agency's failure is compounded by its disregard of record evidence demonstrating that delays remain severe and are likely to worsen. As of September 2025, more than 395,000 EAD renewal applications had been pending for 180 days or longer, and the number of such delayed applications had more than doubled in the preceding fiscal quarter. *See supra* notes 1 & 2. Only ten months earlier, after notice-and-comment rulemaking, USCIS concluded that a permanent 540-day automatic extension was necessary because even a 180-day extension "does not provide

USCIS enough time" to avoid harmful gaps in employment authorization. 89 Fed. Reg. at 101,209–13.

The IFR neither reconciled these prior findings nor identified any material change in circumstances. Instead, USCIS speculated that renewal filings will "substantially decline" due to the attempted termination of the Cuban, Haitian, Nicaraguan, and Venezuelan (CHNV) parole program and of Temporary Protected Status (TPS) designations for people from various countries. *See* 90 Fed. Reg. at 48,809 & n.110. But despite the various actions taken by the federal government to diminish immigration over the past 14 months, USCIS's own evidence shows that the EAD renewal backlog has *increased*. *See supra* notes 1 & 2. Moreover, USCIS ignored that many individuals affected by the termination of the CHNV and TPS designations will seek other forms of immigration relief and therefore will continue to require EAD renewals. The agency further overlooked contemporaneous changes in both immigration law and USCIS policy— including new statutory one-year caps on the length of EAD validity for certain groups[8] and USCIS's own decision to shorten validity periods to as little as 18 months[9]—that will necessarily increase, not decrease, renewal filings and thereby exacerbate backlogs. In short, the IFR eliminated the primary safeguard that has historically mitigated the consequences of those delays, without acknowledging the foreseeable effects on the adjudication system.

The D.C. Circuit has condemned precisely this sort of analytical failure, holding that an agency acts arbitrarily and capriciously when it fails to consider "key aspects of the [overall] program" affected by a rule and disregards the real-world consequences of its change. *Nat'l*

---

[8] *See* Pub. L. No. 119-21, § 100003(b)(1), 139 Stat. 73, 366 (July 4, 2025).

[9] USCIS, *USCIS Increases Screening, Vetting of Aliens Working in United States* (Dec. 4, 2025), https://www.uscis.gov/newsroom/news-releases/uscis-increases-screening-vetting-of-aliens-working-in-us.

*Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1114 (D.C. Cir. 2019). USCIS ignored both the structural causes of its delays and the predictable harms that will flow from eliminating automatic extensions in the face of those delays. As a result, the IFR "falls well short of what is needed to demonstrate the agency grappled with an important aspect of the problem." *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021).

USCIS's central substantive justification for the new rule likewise suffers from analytic defects. In the IFR, USCIS contended that eliminating the automatic extension was necessary because automatic extensions posed risks to "program integrity," national security, and public safety. 90 Fed. Reg. at 48,806–07. But USCIS provided no empirical evidence demonstrating that automatic extensions have in fact caused such harms. Instead, it relied on generalized assertions and a single incident involving an asylum seeker, without establishing any causal connection between the automatic extensions and the asserted risks. *See supra* at 18. Agency action based on conclusory statements and speculative fears that are untethered to evidence in the record cannot stand. *See Sorenson*, 755 F.3d at 708; *Nat'l Lifeline Ass'n*, 921 F.3d at 1114–15.

Furthermore, USCIS's unsubstantiated reasoning is internally inconsistent. The agency acknowledged that EAD renewal applicants have already been vetted and already been deemed eligible for employment authorization, yet it asserted that allowing those individuals to continue working during the renewal period creates unacceptable risks. The agency nowhere explained how likely it is that a once-vetted EAD holder will pose a national security risk that will be caught in the vetting process for a renewed EAD. Nor did the agency explain how allowing EAD holders to keep working while USCIS re-vets them and processes their renewal requests poses a national security risk. That contradiction further undermines the IFR. *See World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025) (declaring agency action arbitrary where

27

reasoning is internally inconsistent); *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987) (same).

Additionally, when an agency reverses course, it must do more than simply assert new priorities; it must "supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 647 (D.C. Cir. 2020); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *Encino Motorcars LLC v. Navarro*, 579 U.S. 211, 222 (2016). And an agency may not "gloss[] over or swerve[] from prior precedents without discussion," or engage in a "wholesale failure to address past practice and formal policies … let alone to explain its reversal of course," which is itself "arbitrary and capricious." *Physicians for Soc. Resp.*, 956 F.3d at 644, 647 (first quoting *Sw. Airlines Co. v. FERC*, 926 F.3d 851, 856 (D.C. Cir. 2019) and then quoting *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 927 (D.C. Cir. 2017)).

USCIS met none of its obligations to address its past practices and explain its reversal of course. In its December 2024 rulemaking, the agency expressly concluded that automatic extensions were necessary to mitigate adjudication delays, prevent workforce disruptions, and protect both workers and employers. 89 Fed. Reg. 101,208, 101,210, 101,212–13. And it concluded that any concern about the "potential for noncitizens to engage in unlawful actions [was] speculative." *Id.* at 101,226. Those findings formed the factual predicate for maintaining—and expanding—the automatic extension framework. In the IFR issued less than a year later, however, USCIS "nowhere even hint[ed]" that it had previously reached the opposite conclusion, let alone explained why those earlier findings no longer apply. *Physicians for Soc. Resp.*, 956 F.3d at 646– 47; *see Nat'l Lifeline Ass'n*, 921 F.3d at 1111 (noting that agency "cannot ignore its prior factual findings"); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1284 (D.C. Cir. 2019)

(explaining that, where a "new policy rests upon factual findings that contradict those which underlay its prior policy," the agency must provide a "reasoned explanation" for disregarding those facts). The agency's silence stands in stark contrast to the "full and rational explanation" required when an agency changes course. *Sw. Airlines*, 926 F.3d at 856.

Moreover, the IFR contravenes USCIS's statutory obligation to safeguard economic stability. *See* 6 U.S.C. § 111(b)(1)(F). The INA charges DHS with administering the immigration system in a manner that accounts for the Nation's economic interests, including labor market stability and the lawful employment of authorized workers. *See, e.g.*, 8 U.S.C. §§ 1101(a), 1182(a)(5), 1324a. By eliminating automatic extensions without addressing the intractable adjudication delays that necessitated extensions in the first place, the IFR predictably forces lawfully authorized workers out of the workforce, disrupts employers, and destabilizes labor markets. Yet USCIS said nothing to reconcile those consequences with its statutory responsibilities; it did not even mention the predictable economic disruption the IFR will cause. USCIS's disregard of a central statutory obligation also renders the rule arbitrary and capricious. *See Judulang v. Holder*, 565 U.S. 42, 55 (2011); *see also Grace v. Barr*, 965 F.3d 883, 901–02 (D.C. Cir. 2020) (stating that an agency acts arbitrarily and capriciously when it "fail[s] to grapple with how [its] policy affect[s] its statutory … mandate," and thereby ignores "an important aspect of the problem" (quoting *State Farm*, 463 U.S. at 43)).

Finally, USCIS failed to grapple with reliance interests in a meaningful way. For years, automatic extensions ensured continuity of employment for individuals who timely filed renewal applications, mitigating the well-documented delays in USCIS adjudications. *See* 81 Fed. Reg. at 82,459–60; 87 Fed. Reg. 26,614; 89 Fed. Reg. 24,628; 89 Fed. Reg. 101,208. Workers, families, employers, and broader stakeholders made consequential financial and operational decisions in

29

reliance on the former rule—particularly after the 540-day automatic extension was made permanent in December 2024. Individuals built careers, pursued education, secured housing, took on debt such as mortgages, and planned families on the assumption that renewal applicants whose applications were timely filed would not lose work authorization due to agency delay.[10] Employers structured hiring, staffing, payroll planning, and employee retention around the assurance of uninterrupted work authorization, while industries dependent on authorized workers—including healthcare systems, research institutions, and training programs—relied on extensions to ensure continuity of patient care, clinical training, and mission-critical research.[11] State and local governments, educational institutions, and nonprofit service providers similarly organized programs and services on the premise of regulatory stability.[12] These reliance interests extend beyond employment itself to core aspects of daily life, including the ability to maintain housing, obtain or renew driver's licenses, access healthcare, and avoid severe financial and social disruption.[13] The IFR upended those settled expectations and will cause widespread loss of

---

[10] Asylum Seeker Advocacy Project (ASAP), Comment on *Removal of the Automatic Extension of Employment Authorization Documents*, DHS Docket No. USCIS-2025-0271, at 5–6 (Nov. 26, 2025), https://assets.ctfassets.net/mioke9r0jdxg/3RCFhdxtHJyarZaw0Ng8Rh/32aaed32e69111640ed2487658cd54c4/ASAP-IFR-Comment-Removal-of-EAD-Automatic_Extensions.pdf.

[11] *See, e.g.*, Econ. Pol'y Inst., Comment on *Removal of the Automatic Extension of Employment Authorization Documents*, DHS Docket No. USCIS-2025-0271, at 2–4 (Dec. 1, 2025), https://www.epi.org/publication/epi-comment-on-dhs-interim-final-rule-eliminating-automatic-extensions-of-employment-authorization-documents/; Ass'n of Am. Med. Colls., Comment on *Removal of the Automatic Extension of Employment Authorization Documents*, DHS Docket No. USCIS-2025-0271, at 2–5 (Dec. 1, 2025), https://www.aamc.org/media/87531/download.

[12] *See* Econ. Pol'y Inst., Comment at 3–5; ASAP, Comment at 6–7.

[13] *See* Human Rights First, Comment on *Removal of the Automatic Extension of Employment Authorization Documents*, DHS Docket No. USCIS-2025-0271, at 10–13 (Dec. 1, 2025), https://humanrightsfirst.org/wp-content/uploads/2025/12/Human-Rights-First-Comment-Interim-Final-Rule-Automatic-Extension.pdf.

employment, disrupt employers who depend on authorized workers, destabilize household finances, and reduce overall economic productivity.

Although USCIS mentioned such reliance interests in passing, 90 Fed. Reg. at 48,809, it did not acknowledge the magnitude of the harms, weigh them against the asserted benefits of the IFR, or explain why those reliance interests do not justify retaining or modifying the prior system. The failure to do so is fatal. *Angelica S. v. HHS*, 786 F. Supp. 3d 158, 174 (D.D.C. 2025) ("Once an agency identifies an element as worthy of consideration, it cannot take action without explaining how it weighed that element against other relevant factors."). Courts have repeatedly vacated agency action where the agency failed to account for reliance interests in comparable circumstances. *See, e.g.*, *Regents*, 591 U.S. at 31 (faulting DHS for failing to consider reliance on deferred action policy, including reliance by recipients who had "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children"; their families; "the schools where [they] study and teach"; "the employers who have invested time and money in training them"; and the governments that counted on the revenue from the taxes they pay); *Angelica S.*, 786 F. Supp. 3d at 174–75.

In short, the IFR reflects a failure of reasoned decisionmaking at every step. USCIS failed to address the critical issue of its own delays, relied on speculation rather than evidence, and ignored substantial reliance interests. Because these defects render the rule arbitrary and capricious, Ms. Doe is likely to succeed on her claim under 5 U.S.C. § 706(2)(A).

## II.    Ms. Doe will suffer irreparable injury unless this Court stays the IFR.

In this Circuit, to secure preliminary relief, the movant must show injury that is certain and great, actual and not theoretical, and beyond remediation. *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. Absent a stay, Ms. Doe will suffer such harm.

Ms. Doe faces the imminent loss of her legal authorization to work, which threatens the complete disruption of her livelihood and the stability of her household. Her current work authorization expires on June 23, 2026, and—unlike prior renewals—she has received no automatic extension while her timely filed renewal application remains pending. Doe Decl. ¶¶ 12, 14–15. Absent relief, Ms. Doe will be forced to cease working as a Spanish-English interpreter, substitute teacher, and tutor—positions that together constitute her sole source of income. *Id.* ¶¶ 18–22. Courts in this Circuit have recognized that the loss of legal work authorization constitutes irreparable harm, particularly where the attendant loss of income is unrecoverable. *See Gona v. USCIS*, No. 1:20-cv-3680, 2021 WL 736810, at *5 (D.D.C. Feb. 25, 2021) (finding irreparable harm where plaintiff lost work authorization and substantial household income due to delayed adjudication of her EAD renewal application); *see District of Columbia*, 444 F. Supp. 3d at 34 (noting that economic harms caused by federal agency action are often irreparable because damages are unavailable).

The harm Ms. Doe faces is not limited to lost wages, but extends to the loss of essential benefits and basic necessities, rendering it quintessentially irreparable. Ms. Doe is the sole breadwinner for her household and supports her young U.S. citizen daughter. Doe Decl. ¶ 22. If she loses her employment, she will be unable to meet basic needs for herself and her child, including rent, food, utilities, and childcare. *Id.* Ms. Doe's childcare subsidy is contingent on her continued employment and income, and her health insurance likewise depends on maintaining a minimum level of earnings. *Id.* ¶¶ 20–21. The loss of these interconnected benefits—housing stability, childcare, and healthcare—constitutes exactly the type of non-compensable, cascading injury that courts in this Circuit deem irreparable. *See District of Columbia*, 444 F. Supp. 3d at 43 (loss of access to food and basic necessities, along with the "psychological and physical distress

32

attending that deprivation," constitutes irreparable harm with "lingering, if not irreversible" effects).

In addition, Ms. Doe's injury is imminent—occurring next month—and virtually certain to occur at this point, given USCIS's current application backlog. Ms. Doe has already taken all steps required to renew her work authorization, yet USCIS has not adjudicated her application and has not provided any extension. Doe Decl. ¶¶ 14, 17. As a result, the loss of her work authorization will occur automatically upon expiration of her current permit. *Id.* ¶ 25. And without authorization to work, Ms. Doe will be unable to pay for her and her daughter's needs—including food, rent, utilities, health insurance, and childcare. *See id.* ¶¶ 22–24. Courts evaluating materially identical circumstances have recognized that the imminent expiration of work authorization due to agency delay constitutes irreparable harm. *See Gona*, 2021 WL 736810, at *5 (finding that the plaintiff's inability to work and loss of income following expiration of her EAD would constitute immediate and irreparable harm).

Finally, these harms cannot be remedied after the fact. Ms. Doe cannot recover lost employment opportunities, restore continuity in her professional roles, or retroactively obtain the income, childcare support, and healthcare coverage she will lose. *See* Doe Decl. ¶¶ 22–26. Nor could any later relief compensate for the destabilization of her family's financial and personal circumstances. *See Ahmed v. Noem*, No. 25-cv-1351, 2025 WL 2299447, at *19–20 (D.D.C. Aug. 8, 2025) (holding that plaintiff's representation that he would be unable to return to his pre-termination employment due to "perceived instability in his immigration status" constituted irreparable injury). Because Ms. Doe's injury is immediate, unavoidable, and irreparable in the absence of interim relief, a stay under § 705 is warranted.

**III.    The balance of equities and public interest favor Ms. Doe.**

The final two factors—balancing the equities and weighing the public interest—"merge when the Government is the opposing party," *Nken*, 556 U.S. at 435, because "the government's interest *is* the public interest," *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). Both the equities and public interest weigh decisively in favor of preserving the status quo while the Court adjudicates the legality of the agency's action.

While Ms. Doe faces immediate, concrete, and severe harm absent preliminary relief, a stay would impose no comparable harm on Defendants. The government suffers no cognizable harm from being required to comply with the law pending further judicial review. *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").

USCIS also cannot claim harm from temporarily continuing its longstanding policy of automatic extensions. USCIS itself adopted and relied upon that system to mitigate adjudication delays, and it remained in place for years without the harms Defendants assert in the IFR. Maintaining the status quo of providing automatic extensions during the pendency of this litigation imposes, at most, administrative inconvenience—not legally cognizable injury. Moreover, the equities weigh especially heavily in Ms. Doe's favor because the harms she faces result directly from the IFR and the *agency*'s ongoing processing delays, not any failure on her part. *See, e.g.*, *Damus v. Nielsen*, 313 F. Supp. 3d 317, 341–42 (D.D.C. 2018). She has complied with all legal requirements, including timely filing her renewal application months in advance. The IFR effectively penalizes her for USCIS's inability to process applications in a timely manner.

In addition, there is a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (cleaned up). That interest is particularly strong where, as here, the agency has bypassed

notice-and-comment rulemaking and failed to engage in reasoned decisionmaking. Ensuring compliance with the APA's procedural safeguards promotes transparency, accountability, and better-informed policymaking. *See Int'l Union, United Mine Workers*, 407 F.3d at 1259 (notice-and-comment procedures "enhance the quality of judicial review" and ensure fairness to affected parties).

The public also has a strong interest in promoting orderly administration of the immigration system, maintaining economic stability, and avoiding unnecessary disruption to the workforce. The automatic extension regime was designed to account for USCIS's processing realities and to ensure that individuals are not penalized for agency delay. Allowing the IFR to take effect while its legality is litigated would create instability and disruption. In addition, the IFR will cause widespread loss of employment authorization for individuals like Ms. Doe who have lawfully worked and timely sought renewal, resulting in lost productivity, labor shortages, and financial instability for families. Employers, in turn, will face workforce disruptions and compliance burdens. Preserving the automatic extension framework during judicial review prevents those harms and promotes continuity in the labor market.

Moreover, the public interest clearly favors protecting vulnerable populations from avoidable harm. *See Altschuld v. Raimondo*, No. 21-cv-02779, 2021 WL 6113563, at *5 (D.D.C. Nov. 8, 2021) (recognizing that public interest prong may pay special attention to the "results for the most vulnerable in our society"). Ms. Doe is a survivor of domestic violence and the sole provider for a U.S. citizen child. The IFR places individuals in Ms. Doe's position at risk of losing the means to support themselves and their families, with cascading consequences for housing stability, child welfare, and community well-being. Preventing those harms serves the public interest.

**IV.    The Court should stay the IFR under section 705 and issue appropriate injunctive relief.**

A stay of the IFR is appropriate preliminary relief to preserve the status quo ante while this case proceeds. Section 705 of the APA allows a court to "postpone the effective date of an agency action or … preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. In effect, a stay under Section 705 "functions as a temporary form of vacatur"—the ultimate relief Ms. Doe seeks here. *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *16 (D.C. Cir. Nov. 22, 2025) (statement of Millett & Childs, JJ.) (internal quotation marks omitted). "Courts—including the Supreme Court—routinely stay already effective agency action." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing *West Virginia v. EPA*, 577 U.S. 1126 (2016)); *see also Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (observing that "various courts have interpreted § 705 to permit a 'stay'—which may be more aptly described as a temporary rollback—even of already-consummated agency action"). Accordingly, the fact that the IFR is "already in effect does not bar this Court from staying [it]— and returning things to the *status quo ante* while this case proceeds—under section 705." *Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 74 (D.D.C. 2025).

The Court should also grant the requested injunctive relief to ensure the efficacy of the stay of the IFR for Ms. Doe and others who applied to renew their EADs between October 30, 2025, and the date of this Court's order. In particular, Ms. Doe respectfully requests that the Court order USCIS to take appropriate steps to ensure that EAD renewal applicants like her have adequate evidence of continued work authorization under the reinstated system of automatic extensions. Until the IFR, USCIS issued receipt notices that explained when a valid receipt notice could be used in conjunction with an expired EAD to prove eligibility to work during the extension period. *See* Doe Decl. ¶ 11, Ex. A. After the IFR, USCIS began issuing receipt notices that stated that they

36

could *not* "be used … in conjunction with an expired" EAD as proof of work authorization. *See id.* ¶ 15, Ex. B. Ms. Doe thus respectfully requests that the Court order USCIS to take necessary steps—whether through a statement on USCIS's website or new receipt notices—to ensure that Ms. Doe and others who remain authorized to work after a stay of the IFR's effective date can prove their continued eligibility. Ms. Doe also requests that, with respect to any injunctive relief, the Court either waive any bond requirement under Federal Rule of Civil Procedure 65(c) or set the amount at $0.

## CONCLUSION

For the foregoing reasons, the Court should grant Ms. Doe's motion and enter a stay under section 705 of the APA, as well as appropriate injunctive relief.

Dated: May 19, 2026

Respectfully submitted,

*/s/ Allison M. Zieve*
Stephanie B. Garlock (DC Bar. No. 1779629)
Hoyeon Kelly Lew (DC Bar No. 90028415)
Allison M. Zieve (D.C. Bar No. 424786)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
sgarlock@citizen.org

Jessica R. Hanson*
Juan E. Bedoya*
Asylum Seeker Advocacy Project
228 Park Ave. S., #84810
New York, NY 10003-1502
(646) 647-6779
jess.hanson@asaptogether.org
juan.bedoya@asaptogether.org

*Application for admission pro hac vice pending*

*Attorneys for Plaintiff Jane Doe*

37